EL PUEBLO DE PUERTO RICO, demandante y apelado, FRANK QUIÑONES, acusado y apelante.

Núm. 13354.—*Sometido:* Diciembre 2, 1948. *Resuelto:* Marzo 28, 1949.

*Carlos E. Colón,* abogado del apelante; *Hon. Procurador General Vicente Géigel Polanco (José C. Aponte, Procurador General Interino,* en el alegato) y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DE JESÚS emitió la opinión del tribunal.

Frank Quiñones y otros fueron acusados de asesinato en primer grado por la muerte de Nazario Confesor García

causada el 13 de diciembre de 1943. Todos solicitaron juicio por separado. Al empezar el del apelante, el fiscal redujo la calificación del delito a asesinato en segundo grado. El jurado lo declaró culpable de ese delito y fué sentenciado el 10 de abril de 1947 a diez años de presidio con trabajos forzados.

■ Conforme resulta de la prueba de cargo, Primitivo Torres, uno de los acusados, compró a Nazario Confesor García un billete del juego de la bolita que resultó premiado con $500. García, quien era un mero agente de la lotería clandestina, se había apropiado el precio y no compró el billete. Con tal motivo el premio no fué pagado.

El día siguiente al sorteo, por la noche, el apelante y otros fueron a la casa de García y violentamente lo condujeron a la de Primitivo Torres, donde después de cerrar todas las puertas y ventanas de la casa, golpearon a García, exigiéndole que entregara el importe del premio. En esos momentos el acusado Quiñones ordenó que mataran a García, lo cual llevó a efecto William Vargas, uno de los que estaba dentro de la casa. Todos se dieron entonces a la fuga escapando de la casa por una puerta posterior.

La prueba del acusado negó que él tuviera interés alguno en el número premiado. Afirmó que hizo gestiones para ayudar a su amigo a cobrar el importe del billete; que no estuvo en la casa de la víctima cuando la condujeron a la de Primitivo Torres, y que si bien se encontró en esta última en los momentos del suceso, fué porque vió numerosas personas aglomeradas frente a la casa y entró para enterarse de lo que pasaba; que en ningún momento ordenó que matasen a García, y por el contrario, trató de evitarlo. Explicó que había huído del sitio porque siendo Secretario de la Corte Municipal no le convenía que se supiera que se hallaba presente en un sitio donde había ocurrido un crimen relacionado con el juego de la bolita.

El jurado no dió crédito a la prueba del acusado. Exami-

nada toda la evidencia, no podemos convenir con el apelante en que el veredicto sea contrario a la prueba.

■■■ Al iniciarse el juicio, la defensa solicitó de la corte que ordenara la citación de Primitivo Torres—coacusado cuyo juicio todavía no se había celebrado—para que declarase como testigo de descargo. El abogado de Torres intervino para oponerse a que se ordenase la citación informando a la corte, en presencia del jurado, que en caso de ser citado, el testigo no declararía, pues invocaría el privilegio constitucional contra la propia incriminación. A pesar de la objeción, Torres fué citado y al ser llamado a declarar por la defensa, su abogado volvió a intervenir informando a la corte que había dado instrucciones al testigo, quien era su cliente, para que no declarase. El testigo mismo manifestó que no deseaba declarar e invocó dicho privilegio. La corte sostuvo su oposición. La defensa entonces consignó lo que se proponía probar con el testimonio de Primitivo Torres.[1]

Considerando que Primitivo Torres no era un mero testigo desconectado con el delito, sino un coacusado; que su declaración habría de versar sobre la transacción que culminó en la muerte ilegal de Nazario Confesor García de la cual se le exigía responsabilidad como coautor; que una vez que Torres fuese obligado a declarar como testigo por la defensa quedaría sometido a un extenso interrogatorio por el fiscal acerca de los detalles del crimen; y por último, no cono-

---

[1]La defensa anunció que Primitivo Torres declararía lo siguiente:

" . . . que el día y hora a que se refieren los hechos, en primera instancia, Frank Quiñones no tenía interés ninguno monetario o de ninguna índole en el billete de la bolita; segundo, que si Frank Quiñones intervino con él en estos hechos fué porque era amigo y correligionario político de un comité político en Ponce, y bajo esas bases Frank Quiñones fué con Primitivo Torres a tratar de localizar a SARO, para ver si en esa forma lograba el pago de esos billetes; tercero: Que Frank Quiñones en ningún momento se personó en la casa de Saro, ni disparó ningún tiro allí, ni actuó en forma alguna, ya que no se personó nunca en casa de la esposa del interfecto, sino que se quedó afuera en otros trabajos, mientras el testigo era el que iba a casa de Saro. Que Frank Quiñones en ningún momento condujo al interfecto a su casa, esto es, a la casa del testigo Primitivo Torres. Quinto: Que Frank Quiñones se encontró en el momento de los sucesos con Primitivo Torres por mera casua-

ciendo nosotros cuál habría de ser la defensa de Primitivo Torres al llamarse su caso a juicio, nos parece claro que él no podría ser obligado a declarar sin violar la Enmienda Quinta de la Constitución y el artículo 2 de la Ley Orgánica que garantizan a toda persona el derecho a no ser testigo contra sí misma en una causa criminal. Pero la defensa sostiene que la declaración de Torres no hubiera podido usarse en contra suya, a virtud de lo dispuesto en la Ley núm. 13 de 9 de abril de 1941, pág. 347.[2] Esta ley surgió como resultado de una opinión del juez ponente en este caso, ac-

---

lidad, cuando ya estaba Saro en casa de Primitivo Torres. Sexto: Que Frank Quiñones en ningún momento hizo manifestación alguna allí y entonces en el cuarto de la casa de Primitivo Torres, ni en ningún lugar, ni en ningún otro momento que pudiese en forma alguna interpretarse como que incitare o aconsejare o que en alguna forma lo hiciera copartícipe del acto criminal que cometió William Vargas (a) Cantinflas. Séptimo: Que en ningún momento hizo manifestación de índole alguna en ningún sitio. Octavo: Que Frank Quiñones, en el momento en que Cantinflas disparó los tiros, trató de evitar el acto, esto es, en el mismo momento que Cantinflas disparó el primer tiro, Frank Quiñones le echó mano, se agarró de la mano de Cantinflas para evitar que éste continuara disparando, pero que entonces Cantinflas, lo amenazó con el revólver, a él y a todos los demás presentes, y tuvieron que acceder al impulso criminal de Cantinflas, quien se adelantó y disparó.'' (T. de E., págs. 240–241.)

[2]Las secciones 1 y 2 de la Ley núm. 13 de 9 de abril de 1941 prescriben:

''Sección 1.—Ninguna persona será procesada, castigada o confiscados sus bienes por testificar o producir evidencia de cualquier clase en un procedimiento, proceso o investigación criminal, y tal inmunidad cubrirá al declarante no sólo en lo declarado por él acerca del delito que se investigue, sino en relación con cualquier responsabilidad en que pudiera haber incurrido con respecto a otros delitos; y toda persona estará obligada a comparecer o declarar ante un fiscal, juez municipal o de paz, cuando éstos la citaren como testigo en una investigación que estuvieren practicando dichos funcionarios; *Disponiéndose*, que la negativa a comparecer o declarar constituirá desacato, que será castigado por la corte de distrito del distrito judicial donde hubiese tenido lugar la citación, o donde el testigo se niegue a declarar, mediante querella presentada ante dicha corte por el funcionario encargado de la investigación, en un procedimiento sumario en el que el querellado tendrá dos días para contestar dicha querella, formulando las alegaciones que estimare pertinentes, debiendo ventilarse la vista dentro de los cinco (5) días siguientes a la contestación del querellado.''

''Sección 2. Esta Ley no se interpretará en el sentido de obligar a una persona a ser testigo contra sí mismo en ninguna causa criminal, y sólo será aplicable a personas naturales.''

tuando como Juez de Turno, dictada el 1ro. de noviembre de 1939, en el caso de *Mandamus* núm. 15 instado originalmente en este Tribunal por El Pueblo de Puerto Rico contra el Honorable Domingo Sepúlveda, Juez de la Corte de Distrito de Ponce. En aquel caso el Fiscal de Distrito de Guayama, actuaba en comisión en el Distrito de Ponce, y mientras practicaba una investigación, citó á una testigo para que declarase ante él. La testigo rehusó hacerlo alegando que su testimonio la incriminaría. El fiscal recurrió entonces a la Corte de Distrito de Ponce solicitando que se ordenase la citación de la testigo para que en presencia de la corte contestase las preguntas que le formulase el fiscal o en su defecto mostrase las causas por las cuales no debiera ser castigada por desacato. La orden fué dictada. La testigo compareció, pero rehusó contestar las preguntas que le hiciera el fiscal. La contestación a dichas preguntas, sin duda, la hubieran incriminado. Comprendiéndolo así el fiscal, formuló entonces la siguiente moción oral: ''Ahora pediremos a V. H. que diga a la acusada (sic) en este momento que con respecto a esta investigación que está haciendo El Pueblo de Puerto Rico no será perseguida por delito público alguno. Esa es la petición que nosotros hacemos a V. H.'' La corte opinó que la contestación a las preguntas propuestas por el fiscal incriminarían a la testigo, y después de exponer que los artículos 239 y 241 del Código de Enjuiciamiento Criminal(³) eran inaplicables cuando el proceso criminal no se había aun iniciado, resolvió que carecía de jurisdicción para conceder la

(³)Los artículos 239 y 241 del Código de Enjuiciamiento Criminal prescriben:

''Art. 239. Cuando dos o más personas hayan sido incluídas en una misma acusación, el tribunal podrá en cualquier tiempo antes de que los acusados hayan empezado su defensa, decretar a petición del fiscal, la exclusión del juicio, de cualquiera de los acusados, con objeto de que sirva como testigo del poder público.''

''Art. 241. El decreto mencionado en los dos artículos precedentes equivale a la absolución del acusado excluído y no podrá por lo tanto, seguírsele otro proceso por el mismo delito.''

inmunidad solicitada y consecuentemente rehusó castigar a la testigo por desacato.

Al denegar el que suscribe el auto de mandamus hizo una recomendación a la Legislatura y siguiéndola, ésta aprobó la Ley núm. 13 de 9 de abril de 1941 ((1) pág. 347), la cual fué encaminada a ampliar el alcance de los artículos 239 y 241 del Código de Enjuiciamiento Criminal a que se refirió el Juez Sepúlveda, y el 43 del Código Penal discutido en la opinión del Juez de Turno. Ninguno de dichos artículos tuvo por objeto conceder inmunidad a un acusado llamado a declarar por un coacusado. Tampoco es ése el propósito de la Ley núm. 13 antes mencionada. Esa inmunidad se concede a los testigos de cargo y a los llamados por un fiscal, juez municipal o de paz para declarar en una investigación que se estuviere practicando por alguno de dichos funcionarios. Una interpretación contraria a ésta, no pudo ser la intención del legislador porque su resultado sería que la inmunidad de un acusado, no importa cuán grave fuese su delito, estaría a merced de que un coacusado tuviera a bien llamarlo como testigo en su defensa. Esa interpretación de dicha Ley núm. 13 conduciría al absurdo.

■ Al exponer la teoría de su caso al jurado, el fiscal anunció que probaría que cuando alguien aconsejó al acusado que no debía intervenir en el cobro del billete, éste contestó: "Que me [aquí una palabra obscena] para eso soy joven y aquí está esto, y sacó un revólver", y que luego al inquirir el acusado el paradero de la víctima, le dijo a otra persona: "Si éste no da el dinero, le vamos a acribillar el corazón a balazos". La defensa se opuso a estas manifestaciones del fiscal y sostiene que con ellas indebidamente impresionó al jurado en contra del acusado. Pero el fiscal no se limitó a anunciar lo que se proponía probar, sí que presentó la prueba a ese efecto. El fiscal estaba cumpliendo con su deber al hacer esas manifestaciones que luego sostuvo con su prueba.

██ También señala como error el apelante el hecho de que el fiscal, para impugnar la veracidad del testigo de la defensa William Vargas, presentara una declaración que éste prestó en el Presidio Insular ante el fiscal Suárez Garriga. El testigo admitió haber hecho tal declaración, pero explicó que no era verdad lo que dijo entonces por haberlo hecho bajo un coraje. Pierde de vista el apelante que la corte, al permitir que la declaración fuese al jurado, les instruyó que la admisión de la misma sólo tenía por objeto impugnar la veracidad del testigo, demostrando que en ocasión anterior el testigo había hecho una manifestación distinta de la que hacía en el juicio.

██ Finalmente se queja el apelante de que no se le suspendiera la sentencia de conformidad con la Ley núm. 259 de 3 de abril de 1946, (1) pág. 535. Consideradas las circunstancias de este caso, reveladoras en el acusado de un corazón pervertido y maligno, y habida cuenta de que el acusado era un funcionario de una corte de justicia, por lo que estaba más obligado que cualquier otro funcionario a respetar la ley, no vemos cómo podría la corte, sin cometer un craso abuso de discreción, suspenderle la sentencia. Demasiado benigna fué al imponerle el mínimo de la pena.

*Procede la confirmación de la sentencia.*

El Juez Asociado Sr. Negrón Fernández no intervino.