EL PUEBLO DE PUERTO RICO, demandante y apelado, *v*. EN-
RIQUE MUÑIZ MEDINA, acusado y apelante.

Núm. 15127.—*Sometido:* Abril 1, 1952.  *Resuelto:* Abril 8, 1952.

*Víctor Rivera Colón* y *Santos P. Amadeo,* abogados del apelante; *Hon. Procurador General Víctor Gutiérrez Franqui (Federico Tilén, Procurador General Interino,* en el alegato), *J. Rivera Barreras, Fiscal del Tribunal Supremo* y *Frank Vizcarrondo Vivas, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

*Per Curiam:* El acusado fué juzgado y convicto de los delitos de ataque para cometer asesinato, portar armas y no registro de armas. El tribunal de distrito le impuso de uno a quince años de presidio con trabajos forzados por el primer delito y por los dos restantes seis meses de cárcel en cada uno. Contra dichas sentencias el acusado entabló recurso de apelación. El 29 de mayo de 1951 presentó moción para que se le fijara fianza en apelación, la cual le fué denegada el 31 de mayo de 1951.

El primer señalamiento es que "La corte erró al procesar y condenar al acusado apelante porque éste tenía completa inmunidad de acuerdo con las disposiciones de la Ley núm. 13 de 1941 (Leyes de dicho año, pág. 347)."

Este error se basa en el hecho de que el acusado hizo una declaración jurada ante el fiscal la cual fué presentada en evidencia en el juicio. Pero nunca llegamos a las cuestiones suscitadas por el apelante en cuanto a la naturaleza y alcance de las disposiciones de la Ley núm. 13, Leyes de Puerto Rico, 1941, en relación con la inmunidad de testigos y su aplicación con respecto a él. Los autos demuestran que el acusado nunca reclamó inmunidad, ni cuando hizo la declaración original al fiscal ni cuando se celebró el juicio en el tribunal inferior. Suponiendo, sin decidirlo, que el acusado tuviera derecho a la inmunidad que reclama, bajo las circunstancias de este caso, *cf. Pueblo* v. *Quiñones,* 69 D.P.R. 731, no vemos base alguna para decir que no tenía que reclamar la referida inmunidad en el juicio. El apelante no ha citado ningún caso y ninguno hemos encontrado que resuelva que tal defensa puede levantarse por primera vez en apelación, como sucede aquí. Habiendo el acusado renunciado a la supuesta reclamación de in-

munidad por no haber levantado la cuestión durante el juicio, es innecesario que examinemos ese punto ahora.

■ El segundo señalamiento es que "El veredicto y la sentencia son nulos porque la acusación es fatalmente defectuosa ya que en ella no se alega que el acusado-apelante disparara contra el policía Aldahondo con la intención específica de darle muerte."

Carece de méritos esta contención, en vista del lenguaje de la acusación que dice en parte que ". . . el referido acusado . . . ilegal y voluntariamente, con malicia premeditada y deliberación, *y con el propósito firme y decidido de darle muerte ilegal*, acometió y agredió con una pistola, que es un arma mortífera, al ser humano nombrado Manuel Aldahondo Torres, haciéndole allí y entonces varios disparos, sin lograr herirlo . . ." (Bastardillas nuestras.)

■ El tercer señalamiento dice que "La corte cometió error al instruir al jurado sobre los elementos del delito de ataque con intención de cometer asesinato ya que no dió énfasis en su instrucción al requisito indispensable de que es necesaria la intención específica de matar para que se cometa dicho delito."

Aparte del hecho de que el acusado no hizo objeción alguna a las instrucciones del tribunal inferior, no encontramos que el juez de distrito cometiera error en sus instrucciones, que en parte dicen así:

"El delito de ataque con intención de cometer asesinato es lo mismo que decir asesinato frustrado. Es aquel delito en que el acusado ha puesto en práctica todos los elementos y todos los recursos necesarios para que el delito de asesinato se produzca, sin embargo el delito no se ha producido por causas ajenas a su voluntad. Asesinato es dar muerte ilegal a un ser humano con malicia y premeditación. El asesinato es de dos grados, primero y segundo. Todo asesinato perpetrado por medio de veneno, acecho o tortura y toda clase de muerte alevosa, deliberada y premeditada o cometida al perpetrarse o intentarse algún incendio de morada, violación, robo, asalto o mutilación, constituye asesinato en primer grado, siendo de segundo grado todos los

demás. La malicia es un elemento esencial en el delito de asesinato. Malicia significa la intención dañosa, el propósito criminal de causar daño a otra persona sin la suficiente justificación o excusa para ello. La malicia es necesario que sea premeditada, prepensada, es decir, concebida por el acusado con anterioridad a la comisión del delito. No se requiere que haya estado pensando en cometer el delito mucho tiempo antes. Basta que lo medite un minuto antes de su comisión para que la premeditación exista. *La intención es un elemento esencial en el delito de ataque con intención de cometer asesinato. Para que exista tal delito es indispensable que la agresión se verifique con la intención premeditada de matar.* Premeditación y deliberación son elementos característicos del delito de asesinato en primer grado. La deliberación no se requiere en el asesinato en segundo grado. En cualquiera de las dos formas en que se intente realizar el asesinato, en primero o segundo grado, si la muerte del agredido no ocurre, ello constituye el delito de ataque con intención de cometer asesinato." (Bastardillas nuestras.)

█ Los señalamientos cuarto y quinto son los siguientes:

*"Cuarto error:* La Corte cometió error al instruir al jurado sobre la autoridad del policía Aldahondo para arrestar al acusado-apelante días después del alegado atentado contra la vida de dicho agente.

*"Quinto error:* El veredicto del jurado es manifiestamente erróneo y contrario a la prueba."

En relación con estos errores, procede citar el resumen y el argumento del alegato del Fiscal que dicen en parte como sigue:

". . . La prueba de cargo consistió de las declaraciones del policía Manuel Aldahondo, del Teniente de la Policía Alejandro Oliveras y del Sr. Jenaro A. Jusino. También ofreció el Ministerio Público, y fué admitida en evidencia, una declaración jurada prestada por el acusado varios días después de los supuestos hechos. Como primer testigo de cargo y único testigo ocular presentado por El Pueblo, declaró el policía *Manuel Aldahondo Torres.* Declaró que el día 31 de octubre de 1951 prestaba servicio en el Cuartel de la Policía de Barrio Obrero, y que ese día como a las cinco de la tarde, el Teniente Oliveras, su jefe inmediato, le ordenó, junto con el cabo Vélez y otro policía más, que se trasladaran frente a la barbería de Vidal Santiago en la calle

Barbosa, donde se había iniciado un tiroteo. Que al llegar cerca de la barbería él se tiró del vehículo y buscó cubierta y comenzó a contestar los disparos que salían de la barbería, y que mientras estaba ocupado guareciéndose y contestando el fuego, de momento notó que de entre la multitud una persona sacó una pistola niquelada, de esas que usan en el ejército, y disparó hacia donde él estaba (R. 9). Que el individuo le disparó de 6 a 8 balas que tiene el peine de la pistola (R. 9), y que a su alrededor (del testigo) no se encontraba ningún otro policía ni guardia nacional. Continuó declarando el policía Aldahondo que tan pronto el individuo hizo los disparos salió corriendo en dirección hacia el norte, hacia la playa (R. 10), y que al írsele detrás, vió que éste se montó en un carro viejo estilo 'truck' que estaba situado como a cien yardas del sitio donde ocurrieron los disparos, el cual estaba guiado por otra persona (R. 10 y 11), y que él y el cabo Vélez persiguieron el vehículo pero el mismo se les perdió de vista. Por último, declaró el testigo que no fué hasta 10 ó 15 días después que pudo identificar a la persona que le había hecho los disparos, por una fotografía que le mostró el Fiscal Aponte en el Cuartel General de la Policía (R. 12 y 26), procediendo el testigo a identificar al acusado como la persona que le había hecho los disparos (R. 10).

"En la repregunta, declaró el policía Aldahondo que el día que sucedieron los hechos fué la primera vez que vió al acusado (R. 14), y que como 15 días después, cuando fué a prestar servicio en la Escuela Henna para las inscripciones, se enteró que el acusado vivía frente a dicha escuela donde tenía un taller de carpintería (R. 14). Declaró además el testigo que al regresar ese día al cuartel no informó esos hechos por escrito en el Libro de Novedades (R. 15). En cuanto a la forma en que ocurrieron los hechos, declaró el policía que ese día había alrededor de 200 personas aglomeradas frente a la barbería de Vidal Santiago, y que los pocos policías y militares que se encontraban allí estaban tratando de entrar al sitio de donde provenían los disparos (R. 16–17). Que al hombre que le hizo los disparos él sólo pudo verlo del pecho hacia arriba, porque estaba dentro de las demás personas, y que era de mediana estatura, más alto que pequeño, blanco trigueño (R. 17). Que notó que éste no tenía sombrero (R. 18), y que vió que la pistola con la cual hizo los disparos era niquelada porque relumbraba con el sol (R. 18–19).

"Continuó declarando el testigo que ese día él no sabía el nombre de la persona que le había hecho los disparos (R. 19), y

que cuando se enteró 15 días después del sitio donde vivía el acusado no pudo arrestarlo porque éste se había ido para Río Grande (R. 19). Que él hacía como dos años que conocía a Agustín Muñiz, hermano del acusado, y que se acordaba que el día 20 de enero de 1951, un domingo, que fué el día siguiente al día en que arrestaron al acusado, Agustín Muñiz se presentó en su casa con un ejemplar del periódico El Imparcial donde había salido la información del arresto del acusado (R. 20–21), y le informó que el acusado era su hermano, jurándole por la Biblia que éste (el acusado) no había tomado parte en esos hechos (R. 22). Que a él le dolió saber que el acusado era hermano de su amigo y permaneció callado, porque éste se había siempre portado muy bien con él, pero que a pesar de eso, él era policía y hasta a un hermano suyo tenía que acusarlo (R. 23). Que él no tenía ninguna duda de que fué el acusado el que le hizo los disparos (R. 27), y que el mismo día de los hechos él insistió con el Teniente en que le habían hecho unos disparos, pero que no se hizo ningún informe en el Libro de Novedades (R. 23–24). Le preguntó entonces la defensa al testigo que por qué si él sabía que Enrique Muñiz le había hecho los disparos había esperado 3 meses para declarar, a lo cual contestó el testigo que 'si usted comete un delito y no lo arresto ahora, a la media hora no lo puedo arrestar' (R. 25). A esa manifestación del testigo solicitó la defensa que la Corte instruyese al jurado en ese momento en cuanto a los arrestos que podía hacer la policía, procediendo el Magistrado a instruir al jurado en la forma siguiente:

" 'Hon. Juez: Señores del jurado, una persona, un policía insular, agente de orden público que ve cometerse ante su presencia un delito cualquiera que sea, puede arrestar a la persona. Esa es la regla en cuanto a los delitos; si pasa tiempo, por ejemplo, una persona ve cometerse cualquier clase de delito hoy y pasa tiempo entre ese día y cuando él vuelve a ver la persona, no tiene autoridad para arrestarlo a menos que no lo haya estado persiguiendo desde el momento de cometer el delito hasta el momento que lo ve. Si la persecución no se interrumpe aunque tarde un mes puede arrestarlo. Esta no es la cuestión en este caso específico. Atiendan lo que dice el policía y la prueba de la defensa. No es la cuestión en este momento lo que está declarando el testigo lo que tienen que tener en cuenta. Él puede decir qué es lo que él cree que es la ley.' (R. 25–26.)

"Trasmitida la instrucción arriba indicada (la cual no fué en forma alguna objetada por la defensa) continuó el testigo decla-

rando que cuando él fué a prestar servicio a la Escuela Henna, durante las inscripciones, él no vió al acusado, y que en el cuartel le informaron que la familia de éste estaba en Río Grande, pero que él no sabía dónde se encontraba en ese momento el apelante (R. 29).

"Como segundo testigo de cargo declaró el Teniente *Alejandro Oliveras,* quien estaba a cargo del Cuartel de Barrio Obrero el día que sucedieron los hechos. En lo pertinente, declaró este testigo que el informe de los hechos ocurridos en Barrio Obrero el 31 de octubre se anotó en el Libro de Novedades el 6 de noviembre de 1950, y que el mismo aparecía firmado por él (R. 35). Que luego, según se siguieron investigando los hechos, se hizo otro informe el 19 de enero de 1951, en relación con el mandamiento de arresto contra el acusado por un delito de ataque para cometer asesinato contra el policía Manuel Aldahondo (R. 36), y que más adelante, el 3 de febrero de 1951, aparecía el informe del policía Aldahondo (R. 37).

"Como último testigo de cargo declaró *Jenaro A. Jusino,* quien dijo ser contratista, y que hacía alrededor de 4 ó 5 años que conocía al acusado, quien le hacía puertas y ventanas para las obras que él contruía. Que el día primero de noviembre de 1950, de 8 a 9 de la mañana, el acusado se presentó en su casa y le pidió que sirviera de intermediario para poder él entregarse a la policía, y que éste le dijo que quería entregarse porque el día antes él había estado 'subversivo' (R. 39). Que él le aconsejó al acusado que, como aquello pertenecía a Barrio Obrero, se debía entregar en el Cuartel de Barrio Obrero, a lo cual le contestó éste que él no quería entregarse en Barrio Obrero porque como él era nacionalista y la policía estaba nerviosa temía que le fuera a suceder algo (R. 40). Que entonces le aconsejó al acusado que se fuera a cualquier sección de la calle Loíza, y que él iría a hablar con su hermano, el cabo Marchani, en el Cuartel de la Policía de la calle Loíza, para ver si conseguía que éste lo fuera a arrestar, lo cual se realizó ese día por la mañana (R. 41).

"En la repregunta, declaró el testigo que cuando el acusado fué donde él estaba turbado. Que le dijo que temía que le pasara algo por el hecho de ser nacionalista, pero que el acusado no le hizo indicación alguna de haberle disparado a ninguna persona, aunque declaró el testigo que tampoco él le preguntó si éste había cometido algún delito (R. 43).

"Anunció entonces el Fiscal que como último testigo pensaba presentar al *cabo Marchani,* manifestando que éste declararía

que el acusado fué arrestado sin orden de arresto, a súplica de él mismo, y que éste se entregó voluntariamente (R. 44). La defensa aceptó que el testigo declararía sobre esos extremos y se aprobó la debida estipulación al efecto.

"Presentó entonces en evidencia el Fiscal la declaración jurada prestada por el acusado ante los Fiscales José C. Aponte, Baldomero Freyre y Angel Viera Martínez, en la noche del 3 al 4 de noviembre de 1950, la cual aparece de las páginas 127 a la página 191 de la transcripción de evidencia. En dicha declaración el acusado manifestó que ocupaba el cargo de Tesorero de la Junta Municipal de Santurce del Partido Nacionalista de Puerto Rico, de la cual era presidente el barbero Vidal Santiago (R. 135); que la Junta Municipal de Santurce se reunía semanalmente en la barbería de Vidal Santiago (R. 136); que la última reunión se celebró como dos semanas antes de los sucesos del 30 de octubre, y que había asistido como a tres reuniones de la Junta Nacional del Partido Nacionalista, de la cual era presidente don Pedro Albizu Campos, secretario Matos Paoli y tesorero Raimundo Díaz Pacheco (R. 134). Declaró en detalle el testigo sobre sus actividades como Tesorero de la Junta Municipal del Partido Nacionalista en Santurce, así como en relación con los distintos actos que celebraba el Partido Nacionalista a través de la Isla, el último de los cuales fué el celebrado en Fajardo el 26 de octubre de 1950, al cual él concurrió en compañía de Vidal Santiago formando parte del grupo que acompañaba a Albizu Campos (R. 145-147). En el curso de la declaración, al acusado no se le preguntó específicamente en cuanto a los hechos que motivaron su acusación por el delito de ataque para cometer asesinato en la persona del policía Aldahondo, pero sin embargo, cuando le preguntaron si había participado en el tiroteo de la barbería de Vidal Santiago, negó rotundamente que hubiese tenido participación en esos hechos (R. 177), y alegó por el contrario, que cuando él oyó que se inició el tiroteo, él se alejó rápidamente de Barrio Obrero, yéndose a refugiar a casa de un hermano para evitar que le fuese a ocurrir algo (R. 163-173), y que al día siguiente, temiendo a los nerviosismos de la policía y a represalias de los propios nacionalistas, le pidió a su amigo Jenaro Jusino que arreglara con la policía para poder entregarse (R. 159-161).

"Esa fué la prueba de cargo que tuvo ante sí el jurado que entendió en la vista de este caso. Analizando esa prueba, y especialmente la declaración del principal testigo de cargo, el po-

licía Aldahondo, alega el apelante que el testimonio de este testigo resulta tan inverosímil y prejuiciado que, a falta de alguna corroboración, el mismo no debió merecerle crédito a los miembros del jurado.

"Comienza por alegar el apelante que el policía Aldahondo admitió que no relató en el cuartel el incidente de los disparos que le había hecho el acusado, ni hizo figurar los mismos en el Libro de Novedades, a pesar de que el testigo informó todos los hechos relacionados con la barbería 'omitiendo todo cuanto se refería a los supuestos disparos héchosle por el acusado' (pág. 24, alegato del apelante). La contención del apelante no está sostenida por el récord. En primer lugar, no hubo prueba de que el informe relacionado con el tiroteo ocurrido frente a la barbería de Vidal Santiago fuese hecho por el policía Aldahondo. El Teniente Oliveras, jefe del cuartel de Barrio Obrero, declaró que no recordaba quien había preparado el informe, pero que él lo había firmado (R. 35), y que el informe se vino a hacer el día 6 de noviembre de 1950, *siete días después de los hechos,* porque 'ante la situación por que estábamos atravesando ese día no era posible coger esos hombres, distraerlos del servicio para sentarlos a hacer un informe' (R. 34). Y aun cuando es cierto que el policía Aldahondo no llevó al Libro de Novedades el incidente relacionado con el apelante, sin embargo, aparece del récord que, a preguntas de la defensa, el policía declaró que *'el mismo día por la tarde'* (R. 24), *'yo insistí con el Teniente que me habían hecho unos disparos y yo insistí en que se investigara'* (R. 23). Y es explicable que, a pesar de haberle relatado al Teniente que a él le hicieron unos disparos, el policía Aldahondo no hiciera constar en seguida esos hechos en el Libro de Novedades, *ya que el testigo no conocía a la persona que le hizo los disparos* (R. 19), y fué 10 ó 15 días después que pudo identificar al acusado por una fotografía que le mostró el Fiscal Aponte (R. 26).

"Tampoco es cierto, como alega el apelante, que, a pesar de haber ido el policía Aldahondo a trabajar a la Escuela Henna, frente a la casa del acusado, durante las inscripciones que se celebraron unos días después de los hechos, éste admitiese que no arrestó al acusado, a pesar de estarlo viendo todos los días en su taller y en su hogar (pág. 25, alegato apelante). Lo que declaró el policía Aldahondo fué que el día que él fué a trabajar a la Escuela Henna se enteró que el acusado vivía allí cerca 'porque la detective estaba allanando la casa' (R. 25), pero eso no significa que ese día él hubiese tenido la oportunidad de identificar al acusado, y

que sin embargo, no hubiese procedido a arrestarlo. El policía Aldahondo no conocía al apelante y categóricamente declaró *que ese día no vió a Enrique Muñiz Medina, y que no sabía dónde estaba* (R. 29). Y es imposible que lo hubiese podido haber visto, porque según aparece del récord, el acusado se entregó a la policía el día *1ro. de noviembre de 1950,* habiendo estado preso hasta el día *10 de noviembre de 1950* (R. 73), siendo de conocimiento judicial que las inscripciones se celebraron en Puerto Rico durante los días 4 y 5 de ese mismo mes (véase R. 182).

"Como hemos dicho antes, el policía Aldahondo vino a identificar a su asaltante 10 ó 15 días después de los hechos, por un retrato que le mostró el Fiscal Aponte, y fué a base de esa identificación que se inició la investigación que culminó en el arresto del acusado el 19 de enero de 1951 (R. 36). Y es lógico pensar que fué precisamente porque los hechos ocurrieron dentro de la confusión que reinaba frente a la barbería de Vidal Santiago, que no se practicó el arresto del acusado inmediatamente después que el policía lo identificó al mostrársele su retrato, y que no fué hasta que los fiscales quedaron plenamente convencidos de la identidad de la persona identificada por Aldahondo que los fiscales no ordenaron el arresto del acusado.

"El apelante indica que el ministerio público pudo haber presentado prueba para corroborar el testimonio del policía Aldahondo, y que sin embargo no lo hizo. Pero se olvida el apelante que se admitió en evidencia la declaración jurada prestada por el acusado la noche del 3 de noviembre de 1950, donde aparece que el acusado declaró que era Tesorero de la Junta Municipal del Partido Nacionalista en Santurce; que el presidente de la Junta era Vidal Santiago; que el acusado estuvo el día de los hechos junto con Vidal Santiago en su barbería hasta unos minutos antes de iniciarse allí el tiroteo (R. 163), y que Vidal Santiago tenía una pistola y le dijo que él iba a defenderse, que hiciera él lo mismo (R. 177), porque él iba a morir como Pedro Albizu Campos (R. 178).

"Y si esas circunstancias no fuesen suficiente corroboración de los hechos relatados por el policía Aldahondo, todavía hay otros detalles que fortalecen el testimonio del principal testigo de cargo. El policía Aldahondo declaró que el individuo que le hizo los disparos corrió en dirección a la playa y se montó '*en un carro viejo estilo truck*' que estaba como a cien yardas de donde ocurrieron los hechos, y que fué en ese vehículo, guiado por otra persona, que éste se pudo escapar (R. 10). Y resulta sig-

nificativo que el acusado declaró en la declaración prestada ante el Fiscal Aponte que él tenía un 'truckcito' (*pick-up*), que antes era carro, y que fué convertido a truck (R. 164).

"La defensa se había esmerado en probar que la persona que había hecho los disparos era un individuo blanco, alto, que estaba en mangas de camisa, y que por el contrario, el acusado ese día, en esos momentos, vestía un traje *con gabán,* de color oscuro. Sin embargo, al preguntársele en el interrogatorio directo a la *testigo de defensa* María Márquez cómo estaba vestido el acusado, declaró ésta lo siguiente:

" 'P. ¿Usted recuerda haber visto por la tarde, a las cuatro o cuatro y media a su excuñado cerca de su casa?

" 'R. Lo ví parado frente a mi casa.

" 'P. ¿Qué queda frente a su casa?

" 'R. Un "radio shop".

" 'P. ¿Sabe quién es el dueño del "radio shop"?

" 'R. Aquí lo ví también .

" 'P. ¿Usted lo vió parado cuando llegó el hermano en un carro? ¿Cuál hermano?

" 'R. El hermano Benjamín.

" 'P. ¿El ingeniero?

" 'R. El ingeniero.

" 'P. ¿Lo montó?

" 'R. Se montó en el carro también.

" 'P. ¿Usted recuerda cómo estaba vestido su excuñado?

" 'R. *Estaba en cuerpo de camisa.*

" 'P. Haga memoria a ver si lo recuerda Ud.

" 'R. *Sí, estaba en cuerpo de camisa.*

" 'P. ¿En ese momento?

" 'R. *Sí señor.'*   (R. 120–121)

"Inmediatamente después de declarar esta testigo, al estipular la defensa que el acusado iba a declarar lo que aparecía en la declaración jurada que había ofrecido El Pueblo en evidencia, la defensa tuvo buen cuidado en añadir a la estipulación que el acusado también declararía 'que cuando él venía por la calle Buenaventura (donde lo vió la anterior testigo) se encontró con su hermano y que se paró unos segundos frente al "radio shop", *él se había quitado el gabán y lo llevaba en el brazo'. . .* (R. 125). Sin embargo, el hermano del acusado había categóricamente declarado que el acusado vestía de gabán cuando lo encontró frente a la tienda de radios (véase R. 94).

"La defensa trató de probar que el acusado no participó en forma alguna en el tiroteo ocurrido en Barrio Obrero, y ofreció prueba para demostrar que tan pronto sonaron los primeros disparos el acusado, que en esos momentos había salido de la barbería de Vidal Santiago, se alejó caminando rápidamente del sitio de los hechos, siendo casi en seguida recogido por su hermano Benjamín y llevado en automóvil hasta la casa de su abuela. . ."

El cuarto error, como hemos visto, se refiere a la instruccción dada por la corte a solicitud del acusado, en relación con la autoridad del policía para arrestar al apelante. Suponiendo que esta instrucción fuera parcialmente errónea, el acusado no objetó la misma y nunca solicitó su corrección. Por tanto no puede levantar la cuestión por primera vez en apelación. Además, no vemos cómo esta instrucción pudo haber sido tan perjudicial como para justificar la revocación del caso.

En cuanto al quinto señalamiento, el acusado presentó varios testigos en relación con su defensa de que no estaba presente en el lugar de los hechos y que él no fué quien disparó al policía Manuel Aldahondo Torres. El jurado resolvió en contra del acusado este conflicto en la evidencia y no encontramos base para intervenir con su actuación a ese respecto.

*La sentencia del tribunal de distrito será confirmada.*