Miguel Cirilo Batalla, peticionario, *v.* Tribunal de Distrito de San Juan, Julio Suárez Garriga, Juez, demandado; Pueblo de Puerto Rico, interventor.

Número 1859.

*Sometido:* 3 de diciembre de 1952. *Resuelto:* 21 de enero de 1953.

*Gaspar Gerena Bras*, abogado del peticionario; *Hon. Secretario de Justicia J. Trías Monge* (*Vicente Géigel Polanco, Ex-Procurador General* en el alegato), *J. Rivera Barreras, Fiscal del Tribunal Supremo y Rafael Ydrach Yordán, Fiscal Auxiliar*, abogados del interventor.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

Este caso tiene su origen en actos de abominable criminalidad que una sociedad ofendida tiene que repudiar con justificado espíritu de indignación colectiva. Están aquí envueltos, sin embargo, derechos fundamentales del hombre, que se alegan violados en las garantías básicas establecidas por las leyes que los reconocen y en cuya protección descansa la grandeza incomparable de la democracia en los pueblos libres del mundo. Para examinar, con la escrupulosa minuciosidad que requieren las cuestiones planteadas los méritos de este recurso, hagamos primeramente la necesaria relación de hechos.

Contra Lucas E. Castro Anguita, Miguel Angel Palóu Márquez y Miguel Cirilo Batalla y Suere—aquí peticionario—se presentaron ocho acusaciones por igual número de delitos de asesinato en primer grado, alegándose en las mismas que dichos acusados, en la noche del 14 al 15 de diciembre de 1949, en San Juan, "ilegal, voluntaria y criminalmente, con malicia premeditada, deliberación, con intención y propósito decidido y firme de matar, demostrando tener corazones pervertidos y malignos, actuando los tres acusados de común acuerdo entre sí, dieron muerte ilegal a [aquí el nombre de cada una de las víctimas: Adela Margarita Mau-

rent Almodóvar, Antonio Rosa Requena, Francisco Rosa Sánchez, Rosa Julia Maurent de Sandín, Josefa Almodóvar Vázquez, Jorge Sandín López, Noemí Franceschi Rivera y Betty Santiago] al perpetrar dichos acusados un incendio malicioso en primer grado, en el edificio habitado, de tres pisos, número 300 para entonces, antes número 51, de la calle Allen de San Juan, Puerto Rico, propiedad de Benigno Luiña y Pérez Villamil, ocupado allí y entonces por seres humanos en dos de sus pisos y en el otro por los Almacenes Palóu de la firma comercial Miguel A. Palóu y Cía., S. en C., habiéndose preconcebido y planeado dicho incendio por los tres acusados entre sí."

Se presentaron también contra ellos, por los mismos hechos, dos acusaciones por delitos de atentado a la vida en las personas de América López de Rosa y Francisco Casanova Rivera.

Luego de ciertas mociones preliminares, el 22 de marzo de 1950, Batalla presentó en el tribunal inferior una moción por la que solicitó, entre otras cosas, que se desestimaran las acusaciones, alegando la existencia de un contrato de inmunidad entre él y El Pueblo de Puerto Rico, por virtud de hechos que, en lo pertinente, expuso así:

"Que el 18 de diciembre de 1949, el acusado Miguel Cirilo Batalla fué arrestado en Sabana Grande por varios policías quienes no le informaron ni el motivo de su arresto ni por qué autoridad u orden de funcionario alguno se le arrestaba. Fué llevado al Cuartel de la Policía de Sabana Grande donde se le sometió a interrogatorios, privaciones y torturas. En Sabana Grande no se le llevó a presencia de magistrado alguno. Luego fué trasladado a la ciudad de Mayagüez donde tampoco se le llevó a presencia de magistrado alguno para sustanciar su arresto. De Mayagüez se le trasladó a San Juan a presencia del Hon. Fiscal Angel Viera Martínez y otros.

"El acusado sufría de lesiones y quemaduras en varias partes de su cuerpo que le producían intenso dolor y malestar físico y moral. Se le llamó a declarar ante el fiscal y sin que se le hicieran advertencias de clase alguna se le comenzó a interro-

gar. Se le obligó a dar carreras por el salón y en distintas poses para que ciertos testigos trataran de identificarlo. Luego se le obligó a someterse al examen de varios médicos citados por los fiscales para obtener diagnóstico de sus quemaduras. Porque el acusado en su primera declaración no declaró de acuerdo con la conveniencia de los fiscales por temor a incriminarse y por habérsele negado su derecho a consultar con abogados, amigos y familiares y por tenérsele incomunicado y rodeado de policías, detectives y otros funcionarios extraños y hostiles, se le injurió y maltrató de palabras en forma grosera y ofensiva."

"Luego se le llevó a una habitación obscura donde ciertos agentes de la policía y de la detective comenzaron a coaccionar al acusado. Se le hicieron promesas a nombre de los fiscales para que se hiciera testigo de El Pueblo de Puerto Rico. Se ejerció coacción moral. Un detective le informó que un alto funcionario de la Policía Insular en quien él podía creer, le iba a hablar. Vino el Ayudante del Coronel de la Policía Insular y le leyó al acusado las disposiciones de la ley referentes a la obligación que tienen los testigos de declarar ante un fiscal para tener derecho a ser exonerados de todo delito. Este señor le dijo: 'Míreme bien a la cara. Cuando una persona como yo llega en Puerto Rico a ostentar un cargo de honor y de la alta responsabilidad que yo ostento, es porque a esa persona se le reconocen valimientos, integridad, capacidad y méritos personales que están por encima de toda clase de influencia extraña. Yo soy un caballero. Declare la verdad al fiscal para que él lo haga testigo del Pueblo de Puerto Rico.' Que luego otro detective vino y le dijo: 'Mire, Batalla, aquí hay un fiscal que es un miembro de la Masonería de Puerto Rico. Usted puede confiar en él. Declare ante él.' Que entonces el acusado convencido y creído de la buena fe de todas estas manifestaciones, mandó a llamar al Fiscal Freyre a quien se refirió el detective como un Fiscal Masón. Que al informar el detective en la salida donde estaban los fiscales de la intención del acusado de contratar con el Fiscal Freyre, se le adelantó el Hon. Fiscal Ángel Viera Martínez y le dijo al acusado: 'Ayúdeme'. Y con una visible emoción en sus ojos, le dijo: 'Yo le prometo a usted que no habrá de ir a la Corte como acusado'.

"Que el acusado, tocado en su fibra emocional, accedió a declarar ante el Hon. Fiscal Viera Martínez. Que declaró ante

él,. en una habitación privada donde se revelan fotografías, estando presentes únicamente la taquígrafa del fiscal, éste y el acusado. No se le hicieron advertencias verbales de clase alguna. (Si alguna advertencia apareciere de dicha declaración, fué puesta en la forma ordinaria y corriente que es costumbre en los taquígrafos de fiscalía sin que el acusado se enterara de ella o la entendiera.) Así declaró (*sic*) ante el fiscal su segunda declaración donde conectaba a su coacusado Miguel Ángel Palou. Que entonces hubo en el cuartel manifestaciones de júbilo, se permitió a los representantes de la Prensa acceso para tomar fotografías. Se careó al coacusado Palou con el acusado. Se le proporcionaron al acusado facilidades para aseo y asistencia médica que antes se le habían negado. Todo después de más de treinta (30) horas de tortura y agotamiento físico y moral.

"Luego se trasladó al acusado al Hospital Municipal donde quedó recluído. Uno o dos días después le visitó el Fiscal Ángel Viera Martínez y luego de ratificar al acusado su promesa de inmunidad y habiéndose convenido la ampliación de su declaración anterior, volvió el acusado a declarar ante el fiscal. En esta tercera declaración el acusado conecta al otro coacusado Don Lucas Castro Anguita. En esta última declaración aparece el fiscal haciendo advertencias al acusado y éste aceptando responsabilidades y castigos, pero nada de lo expresado sobre esa materia lo interpretaron las partes como una renuncia al derecho de inmunidad del acusado por cuanto privaron instrucciones del fiscal de carácter privado y otras que el acusado interpretó como que para tener la aceptación favorable de la opinión pública, era menester que de su declaración apareciera, en forma espontánea y voluntaria, su arrepentimiento por el daño causado a la sociedad puertorriqueña, lo que en realidad sentía el acusado y quería repararlo sirviendo a la justicia. Que tales admisiones obedecieron a un estado emocional de reparación, no haber tenido asistencia de abogado que le asesorara en cuanto a sus derechos y responsabilidades y por haber creído de buena fe que el fiscal cumpliría su promesa y porque interpretó que la condición de caballero del fiscal estaría por encima de todo formulismo ya que el propio fiscal le testimonió estar obligado moral y legalmente, así como el Pueblo de Puerto Rico, por la cooperación que estaba prestando a la Justicia de Puerto Rico.

"Que más tarde se le recluyó en la Penitenciaría Insular de Puerto Rico con instrucciones especiales del Fiscal Viera Mar-

tínez. En esta institución se le ha tratado con suma cortesía y decencia, lo que el acusado reconoce en franco espíritu de justicia. Sin embargo, por instrucciones del Fiscal, Hon. Ángel Viera Martínez, no se le permitió que él hablara con su hermana de crianza, doña Paulina Díaz, ni con su hermana carnal que vino de Nueva York a visitarle, doña Juliana Batalla, sino bajo custodia estricta y con la prohibición de que no hablara absolutamente nada en relación con su caso, todo lo cual es contrario a la ley. Que en la visita del fiscal a la Penitenciaría volvió a ratificarle al acusado su promesa de inmunidad.

"Que al percatarse la hermana carnal del acusado de que éste estaba siendo sometido a restricciones y engaños artificiosos con apariencia de utilidad, optó por contratar abogados para que asistieran a su hermano. Lo cual hizo. Que más tarde se enteró el acusado que el Fiscal Ángel Viera Martínez había hecho manifestaciones en la Prensa de que no iba a utilizar al acusado como testigo de El Pueblo de Puerto Rico para no tener que exonerarlo, lo cual constituyó y ha constituído una sorpresa para el acusado. Sin embargo, el Hon. Fiscal Ángel Viera Martínez utilizó y presentó en evidencia ante el Hon. Tribunal de Distrito de San Juan, la declaración del acusado en los casos de Hábeas Corpus radicados ante esta Corte por los coacusados Lucas Castro Anguita y Miguel Ángel Palou a los fines de mostrar causa probable en su contra, y en ambos casos dicha declaración del acusado fué aceptada por la Hon. Corte, todo lo cual constituye no sólo una ratificación del contrato de inmunidad por esta Hon. Corte sino que por sí solo y de acuerdo con los artículos 239 y 241 del Código de Enjuiciamiento Criminal de Puerto Rico cuyo alcance ha sido ampliado por la Ley núm. 13 del 9 de abril de 1941, ello implica una exoneración de los delitos imputados al acusado ya que equivale a haber puesto a declarar al acusado en contra de sus coacusados en un procedimiento dentro de la administración de la justicia criminal de Puerto Rico.

"Que las restricciones a que ha estado sometido el acusado, quien es ciudadano de Cuba, con una fianza para su libertad provisional, excesiva e improcedente si se considera como una fianza para asegurar su comparecencia lo mismo como acusado que como testigo, siendo como es persona insolvente, padre de dos hijos menores de edad residente en la Habana, Cuba, y sin amigos, familia o relacionados en Puerto Rico; el haberle negado al acusado la igual protección de la ley tanto en lo substantivo

como en lo procesal y constitucional; el negarle sus derechos adquiridos por razón de su nacionalidad y por razón del contrato de inmunidad celebrado con el Pueblo de Puerto Rico, constituye todo una flagrante violación de las garantías que emanan del Derecho Internacional Privado y del Derecho Internacional Público, contenidas en Tratados, Conferencias, Acuerdos y Convenciones Internacionales de las que son signatarias la República de Cuba y el Gobierno de los Estados Unidos de América."

Los fundamentos de su solicitud los consignó así:

"Porque el acusado fué obligado a comparecer y declarar ante el fiscal mediante arresto ilegal y fué obligado a ser testigo contra sí mismo en violación de la Enmienda 5ta. de la Constitución de los Estados Unidos y del artículo 2 de la Ley Orgánica de Puerto Rico y de la Ley núm. 13 del 9 de abril de 1941 que dispone 'Ninguna persona será procesada por testificar o producir evidencia de cualquier clase en un procedimiento, proceso o investigación criminal, y tal inmunidad le cubre no sólo en lo declarado por él en el delito que se investiga sino en relación con cualquier responsabilidad en que pudo haber incurrido con respecto a otros delitos'.

"Que hubo coacción física y moral para obtener una supuesta confesión del acusado mediante promesa del fiscal y de sus agentes en su nombre y representación, para otorgar completa exoneración de los delitos al acusado si confesaba y producía evidencia que conectara a los coacusados Miguel Palou Márquez y Lucas Castro Anguita, la cual promesa fué creída de buena fe por el acusado y de buena fe declaró y ha estado dispuesto a servir como testigo del Pueblo de Puerto Rico en cumplimiento de su compromiso, resultando que el incumplimiento de la promesa del fiscal, procesando al acusado, constituye una violación del compromiso hecho por el fiscal que empeñó la buena fe y el buen crédito del Pueblo de Puerto Rico.

"Que la promesa del fiscal al acusado mediante la cual obtuvo su confesión y la prueba necesaria para procesar a los coacusados Miguel Palou y Lucas Castro, ha sido ratificada por esta Corte al aceptar en evidencia la declaración del acusado ofrecida por el fiscal en los recursos de Hábeas Corpus radicados por los coacusados Palou y Castro ante este Hon. Tribunal y bajo los números [en blanco] constituyendo este procedimiento

por sí solo una exoneración de los delitos imputados al acusado dentro del espíritu de los artículos 239 y 241 del Código Penal, cuyo alcance ha sido ampliado por la Ley 13 del 9 de abril de 1941, según sentencia del Tribunal Supremo de Puerto Rico en el caso de *Pueblo* v. *Quiñones,* 69 D.P.R. 731, que expresamente autoriza al fiscal a conceder inmunidad por testificar o producir evidencia de cualquier clase en un procedimiento, proceso o investigación criminal, siendo las supuestas advertencias del fiscal en dicha declaración así como las admisiones del acusado respecto a la aceptación de castigos, puro formulismo en entendido del fiscal con el acusado ya que privaron promesas, manifestaciones, representaciones y conducta del fiscal en su interés y empeño para procesar y conectar a los coacusados Palou y Castro en la comisión de los delitos.

"Porque se privó al acusado Miguel Cirilo Batalla, ciudadano de Cuba, de tránsito en Puerto Rico, y no domiciliado en este país, del derecho constitucional y estatutario de estar asistido de abogado durante todo el proceso de investigación, en violación de las disposiciones de los artículos 44, 11 y 141 del Código de Enjuiciamiento Criminal de Puerto Rico y del artículo 2, inciso 2 de nuestra Carta Orgánica y la doctrina sentada en los casos de *Wood* v. *United States,* 128 F.2d 265, 270; *Powell* v. *Alabama,* 287 U. S. 45; *Johnson* v. *Zerbst,* 304 U. S. 458; *People* v. *Napthaly,* 105 Cal. 641, y en violación de la internacionalización de las garantías constitucionales que protegen los derechos de extranjeros y que rigen como regla positiva de derecho internacional. (D.I.P. de V.N. Romero del Prado.)

"Porque el ministerio público no tiene causa probable contra el acusado una vez eliminadas todas las pruebas producidas por el acusado desde su arresto en Sabana Grande, la supresión de cuya evidencia se solicita en este acto por haber sido obtenida la misma ilegalmente y por haber actuado el fiscal en su doble capacidad de fiscal y magistrado a virtud de preceptos legales que son contrarios a la Constitución Americana por constituir una invasión de la rama ejecutiva en el poder judicial."

El 27 de marzo de 1950, fecha señalada para la lectura de las acusaciones, el tribunal ordenó—ante la no comparecencia de Batalla—que se registrara a su favor una alegación de no culpable y petición de juicio por jurado, y el 18

de abril declaró sin lugar la moción de desestimación presentada por dicho acusado el 22 de marzo, expresándose en la forma que indica el incidente que a continuación transcribimos:

"Hon. Juez: La Corte va a resolver. Sin lugar la moción sobre traslado radicada el día 22 de marzo de 1950 por entender que el estatuto que se alega da base a esa moción es la Ley núm. 13 de 1941 no es de aplicación *porque ese estatuto se aplica únicamente a los testigos y no a los acusados que confiesan* y en segundo lugar porque todas las cuestiones planteadas en cuanto a la confesión del acusado *son cuestiones que pueden y deben ser planteadas en el juicio.* Si la confesión fué obtenida por medio de un engaño o por medio de un 'inducement' entonces *podrá ser atacada la admisión de esa confesión* por los medios que da la ley y la jurisprudencia y la Corte resolverá sobre ese punto *cuando le sea planteado durante el juicio.* A nuestro juicio, sin resolverlo, *entendemos que aquí en Puerto Rico no hay cuestiones prejudiciales.* Aquí la Corte no puede resolver nada *sobre los hechos del caso* antes de que el caso sea sometido a un jurado o al tribunal. Entiende eso la Corte y no lo resuelve porque cree que no es necesario resolverlo *ya que está resuelto y porque se pueden plantear esas cuestiones el día del juicio.* La razón que piensa la Corte para esa conclusión es obvia. Si tuviera que resolver ahora mediante prueba presentada por ambas partes que Miguel Cirilo Batalla, al confesar ante el Fiscal, lo hizo voluntariamente y sin necesidad de que le ofrecieran nada, entonces estaría yo resolviendo que él es culpable del delito que se le imputa porque él en su moción admite que hizo esa confesión y que hizo esa confesión de un delito *y que la hizo mediante la promesa de que sería exonerado.* Al resolver que no la hizo mediante esa promesa estaría resolviendo sobre su culpabilidad y eso no lo contempla el Código de Enjuiciamiento de Puerto Rico ni la Carta Orgánica ni el enjuiciamiento al estilo americano. De lo contrario, *si estuviera resolviendo que el Fiscal le ofreció inmunidad tendría que absolver al acusado.* Tampoco lo contempla nuestro modo de enjuiciar. Sin resolver, entiendo que es una de las razones por las cuales no hay en Puerto Rico estas cuestiones de hecho antes del juicio. *Es el jurado en su día quien tiene que resolver si la confesión fué obtenida mediante engaño o*

*promesa, si no se cumplió, si es admisible o no resolverá la Corte.* . . .

"Hon. Juez: ¿Alegación?

"Lcdo. Gerena Bras: Queremos primero que vuestro honor conteste una pregunta. ¿Vuestro honor resuelve sin lugar la cuestión de la suspensión de los procedimientos? Queremos saber si vuestro honor entiende que la cuestión de inmunidad que hemos levantado es una cuestión para ser planteada en el juicio o antes.

"Hon. Juez: La cuestión de inmunidad no se puede plantear ante ningún sitio; ni ante la Corte ni ante el jurado ni ante la Corte Federal *porque no hay estatuto que sancione la inmunidad.* Lo que puede plantear el acusado es que como dice que esa confesión fué obtenida mediante una falsa promesa, *cuando .el Fiscal la ofrezca oponerse a ella y la Corte resolverá de acuerdo con las pautas del Tribunal Supremo si es o no voluntaria.* Sobre *si el Fiscal ofreció inmunidad o no,* mi criterio es que no se puede plantear porque eso sería un contrato contrario a la ley.

"Lcdo. Gerena Bras: *Queremos saber y estar seguros de que al acusado en este caso no se le va a permitir presentar prueba en apoyo de la existencia del contrato de inmunidad antes del juicio.*

"Hon. Juez: *Antes del juicio no. En el juicio si es atacando la confesión.*

"Lcdo. Gerena: Excepción a la resolución de la Hon. Corte por entender que la cuestión de inmunidad es necesariamente una cuestión a plantearse antes del juicio y que debe conocer y resolver la Corte de acuerdo con la prueba que se presente ante el Juez. Que se entienda que el acusado en ningún momento renuncia a su derecho a plantear esa cuestión antes del juicio. Si después de eso vuestro honor quiere entrar alegación de inocencia y señalar el juicio nosotros no podedos evitarlo." (Bastardillas nuestras.)

El 1ro. de mayo presentó la siguiente moción, común para todas las causas seguidas en su contra:

"Por cuanto este Hon. Tribunal resolvió el día 18 de abril de 1950 y en las causas del título 'que la Ley núm. 13 del 19 de abril de 1941 no es aplicable porque ese estatuto se aplica únicamente a los testigos y no a los acusados que confiesan; que

aquí en Puerto Rico no hay cuestiones prejudiciales; que 'la cuestión de inmunidad no se puede plantear ante ningún sitio; ni ante la Corte, ni ante el jurado, ni ante la Corte Federal porque no hay estatuto que sancione la inmunidad; que lo que puede plantear el acusado es que como dice que esa confesión fué obtenida mediante una falsa promesa, cuando el Fiscal la ofrezca oponerse a ella y la Corte resolverá de acuerdo con las pautas del Tribunal Supremo si es o no voluntaria; que sobre si el Fiscal ofreció inmunidad o no, el criterio de la Corte es que no se puede plantear porque eso sería un contrato contrario a la ley; que la única prueba que permitiría que el acusado presente en apoyo de la existencia del contrato de inmunidad será en el juicio y únicamente para atacar la admisibilidad en evidencia de la confesión del acusado';

"POR CUANTO teniendo conocimiento judicial este Hon. Tribunal de que se usó el testimonio del acusado Miguel Cirilo Batalla en el procedimiento de hábeas corpus presentado ante este Hon. Tribunal por el coacusado Lucas Castro Anguita y que en dicho procedimiento el abogado del acusado Lucas Castro Anguita hizo oposición a que se admitiera el mismo y solicitó sin éxito que se trajera personalmente el acusado Miguel Cirilo Batalla para ser contrainterrogado y esto fué denegado por la Hon. Corte y que igualmente el testimonio del acusado fué usado en el hábeas corpus presentado por su otro coacusado Miguel Ángel Palou ante esta misma Corte y a pesar del conocimiento judicial que tiene de estos procedimientos este Hon. Tribunal se ha negado y se niega a exonerarlo de las acusaciones presentadas en los casos del título de acuerdo con la interpretación que debiera darse a la Ley núm. 13 del 19 de abril de 1941, la Enmienda 5ta. de la Constitución de los Estados Unidos de América y la sección 2 del Acta Orgánica de Puerto Rico;

"POR CUANTO tampoco se ha permitido al acusado presentar prueba antes de juicio sobre que después de haber prestado su segunda declaración ante el Hon. Fiscal Viera Martínez, personalmente se usó el testimonio del acusado, en un procedimiento de 'CAREO' con el coacusado Miguel Angel Palou donde arbitraban como 'Committing Magistrates' los fiscales con el propósito de conseguir evidencia contra el coacusado Miguel Ángel Palou de todo lo cual se tomó récord taquigráfico y se hizo de conocimiento público por la prensa del país, constituyendo esto un 'procedimiento' dentro del alcance de la Ley núm. 13 del 19 de abril de 1941;

"POR CUANTO la defensa de inmunidad es una que presupone la admisión por el acusado de los hechos delictivos denunciados y la admisión o no admisión de la confesión del acusado en evidencia nada resuelve sobre la desestimación de las acusaciones ya que queda expuesto a ser convicto por otra evidencia obtenida por la información contenida en su confesión y las múltiples brechas y cauces que abren a los investigadores esta clase de evidencia así obtenida y producida por el acusado, y por cuanto el acusado en ningún momento ha repudiado ni negado la verdad de los hechos en relación con su participación en la comisión de los delitos que se imputan en las acusaciones y sí solamente se ha limitado a ejercer un derecho que le reconoce la ley y la jurisprudencia para ser exonerado de los delitos;

"POR CUANTO el criterio jurídico de este Hon. Tribunal es contrario a la liberal interpretación que han tenido en las jurisdicciones federales y estatales de los Estados Unidos, estatutos iguales o similares al estatuto de inmunidad de Puerto Rico;

"POR TANTO, el acusado admite los hechos alegados en todas las acusaciones y voluntariamente solicita que se le declare convicto de los hechos expuestos en las mismas, *ya que su propósito es establecer apelación para ante el Hon. Tribunal Supremo de Puerto Rico.*" (Bastardillas nuestras.)

El 9 de mayo—ocho días después de haberle declarado el tribunal, en virtud de dicha moción, convicto en todas las causas, pero antes de ser sentenciado—Batalla solicitó que se le permitiera retirar su alegación de culpabilidad, alegando, en lo pertinente, lo que sigue:

"1. Que el día 1 de mayo y por los fundamentos contenidos en la moción radicada en dicho día, el acusado admitió los hechos alegados en las acusaciones por ser su propósito establecer apelación para ante el Hon. Tribunal Supremo de Puerto Rico a base de su teoría de que debe ser exonerado de los delitos por las alegaciones contenidas en su moción discutida y resuelta el 18 de abril de 1950, sin que se permitiera al acusado presentar prueba en apoyo de las mismas. 2. Que a pesar de que la alegación del acusado se le llamó de culpable, *como cuestión de derecho su alegación es de inocente,* aunque como cuestión de hecho el acusado admitió que *los hechos alegados en las acusaciones* eran ciertos ya que como se explica en dicha moción *la defensa de inmunidad presupone la admisión por el acusado de*

*los hechos delictivos denunciados.* 3. Que surge claro de la moción presentada el día 1 de mayo así como de la discusión de la misma que la intención del acusado era apelar para ante el Tribunal Supremo de Puerto Rico la Resolución del Hon. Juez del 18 de abril de 1950 declarando sin lugar la misma sin permitir al acusado ofrecer prueba en apoyo de las alegaciones. 4. Que tanto al acusado como al abogado así como al Hon. Juez y los Fiscales Freyre y Viera Martínez, nos tomó por sorpresa que se hubiera aprobado la Ley núm. 128 del 26 de abril de 1950 que impide al acusado en este caso establecer apelación para sustanciar las alegaciones que este Hon. Tribunal declaró sin lugar el día 18 de abril de 1950. 5. El propósito claro del acusado al declararse culpable era apelar al Tribunal Supremo y esto era de conocimiento de la Hon. Corte y de los Fiscales porque así lo expresó este abogado en el momento de hacerse la alegación, y constituye una sorpresa para el acusado y para el abogado la aprobación de la referida Ley 128 de la cual no tuvimos conocimiento hasta el día 2 de mayo de 1950 todo lo cual comunicamos al Hon. Juez y al Fiscal Viera a los fines de que la sorpresa de la aprobación de la ley afectaba sustancialmente los derechos del acusado y que de haberse tenido conocimiento con anterioridad *el acusado hubiese hecho alegación de inocente para poder tramitar su apelación.* 6. Que la alegación de culpabilidad hecha por el acusado es errónea y nula por cuanto la hizo *pensando en su derecho de apelar y fué informado por este abogado de que tendríamos el derecho de apelar* ya que desconocíamos que se hubiera aprobado la Ley 128 porque la prensa no dijo nada de dicha ley hasta el día 2 de mayo, y sería injusto que se aplicara en este caso el principio 'constructive notice' porque como cuestión de hecho el acusado desconocía que en fecha tan reciente se hubiera aprobado una ley que perjudicaba sus derechos sustanciales. 7. Que la alegación de culpabilidad es además nula por los fundamentos que se exponen en el Affidavit de Méritos que se acompañará a esta moción. 8. Que de no ejercer este Hon. Tribunal su sana discreción para permitir que se retire la alegación de culpabilidad y se sustituya por la denegación se violarían derechos sustanciales del acusado para tener su día en corte de acuerdo con el debido procedimiento de ley. POR TODO LO CUAL del Hon. Tribunal se solicita que permita al acusado retirar su alegación de culpabilidad y sustituirla por la de negación de los delitos impu-

tados y en este acto ofrece probar todos los hechos alegados en esta moción y los contenidos en su Affidavit de Méritos." (Bastardillas nuestras.)

La referida solicitud fué denegada y el 8 de junio siguiente fué sentenciado a la pena de reclusión perpetua en cada uno de los casos de asesinato en primer grado y a la de uno a diez años de presidio en los de atentado a la vida, todas dichas sentencias a ser cumplidas concurrentemente.

Acudió entonces el peticionario ante este Tribunal, en solicitud de *certiorari*, sosteniendo que el juez sentenciador cometió error al resolver (1) que la Ley núm. 13 de 19 de abril de 1941 ((1) pág. 347) no le es aplicable a él porque la misma protege únicamente a testigos y no a acusados; (2) que en Puerto Rico no hay cuestiones prejudiciales (*pleas in bar*); (3, 5) que la cuestión de inmunidad no se puede plantear ni ante jurado ni ante el tribunal porque no hay estatuto que sancione la inmunidad y que si el fiscal ofreció inmunidad ello sería un contrato contrario a la ley; (4, 6) que lo único que podía plantear el acusado, y la única prueba que le permitiría presentar en apoyo de la alegación de inmunidad, era la involuntariedad de la confesión, para atacar su admisibilidad en evidencia; (7) que no existía obligación implícita por parte de El Pueblo de exonerar al acusado por haber el fiscal utilizado su testimonio escrito como prueba para mostrar causa en los recursos de hábeas corpus instados por los coacusados Lucas Castro Anguita y Miguel Ángel Palou; (8) no permitir prueba para que el acusado demostrara que se le utilizó personalmente en un procedimiento de "careo" con el coacusado Palou, de lo cual se tomó récord taquigráfico, siendo por lo tanto un "procedimiento" dentro del alcance de la Ley núm. 13 de 19 de abril de 1941; (9) declarar sin lugar su moción para retirar la alegación de culpabilidad a sabiendas de que hubo inadvertencia y errónea impresión de la ley en el acto de la confesión; (10) no exonerarle cuando fué compelido a declarar como testigo de El Pueblo en el juicio contra Palou, en el

cual su testimonio condujo a la convicción de éste; (11) declararle convicto y sentenciarle en cada una de las acusaciones, sin determinar el grado del delito según lo exige el artículo 310 del Código de Enjuiciamiento Criminal, y a sabiendas de que "los asesinatos y atentados a la vida se cometieron en ocasión de la comisión de un delito distinto al que se alegó en las acusaciones."

Por la importancia de las cuestiones envueltas expedimos el auto de certiorari. Pasemos a considerarlas.

## I

### El Privilegio Contra la Autoincriminación.

El párrafo 3 del artículo 2 de la Ley del Congreso de 2 de marzo de 1917—Ley Orgánica de Puerto Rico—que estuvo en vigor hasta el 25 de julio de 1952, fecha en que comenzó a regir la Constitución del Estado Libre Asociado de Puerto Rico, disponía: "Ninguna persona . . . será obligada en ninguna causa criminal a ser testigo contra sí misma." Dicha disposición es idéntica a la contenida en la Enmienda V de la Constitución de los Estados Unidos, (1) que establece el privilegio contra la autoincriminación. (2)

El privilegio contenido en la referida Enmienda V—que no se extiende a los estados ni está incluído en la cláusula sobre debido procedimiento de la Enmienda XIV, *Adamson* v. *Coliforna*, 332 U. S. 46, 91 L. ed. 1903; *Palko* v. *Connecticut*, 302 U. S. 319; *Twining* v. *New Jersey*, 211 U. S. 78, 53 L. ed. 97, dando protección únicamente respecto a delitos federales, *United States* v. *Murdock*, 284 U. S. 141, 76 L. ed.

---

(1) Dicha Enmienda V, en lo pertinente, dispone: "That no person . . . shall be compelled in any criminal case to be a witness against himself."

Las Constituciones de todos los Estados de la Unión, a excepción de las de Iowa y New Jersey, contienen disposiciones similares. En estos dos estados, sin embargo, el privilegio contra la autoincriminación se ha reconocido como parte de la ley común del estado. *State* v. *Height*, 117 Iowa 650, 91 N.W. 935; *State* v. *Zdanowicz*, 69 N.J.L. 620, 55 Atl. 743.

(2) En la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico—párrafo 3, sección 11, artículo II—se consagra dicho privilegio en la siguiente forma: "Nadie será obligado a incriminarse mediante su propio testimonio . . ."

210; *Brown* v. *Walker*, 161 U. S. 591, 40 L. ed. 819; 41 Yale L. J. 161; 45 Harv. L. Rev. 595—protege a los acusados en procesos criminales de ser compelidos a prestar testimonio, así como también a cualquier testigo de ser compelido a contestar cualquier pregunta cuya contestación pueda incriminarle. *Counselman* v. *Hitchcock*,(³) 142 U. S. 547, 562, 35 L. ed. 1110; Wigmore *on Evidence*, 3ra. ed., sección 2252(a).

En *Counselman* v. *Hitchcock*, supra, el Tribunal Supremo Nacional, al determinar el alcance de la Enmienda V en lo relativo a la cláusula contra la autoincriminación, dijo: "Es imposible que el significado de esta disposición constitucional sea solamente que una persona no pueda ser obligada a ser testigo contra sí misma en una acusación criminal en contra suya. Indudablemente que cubrirá tales casos, pero no está limitada a ellos. Su objeto fué garantizar que una persona no sería obligada, cuando declarara como testigo en cualquier investigación, a dar testimonio que pudiera tender a demostrar que ella misma fué la autora del crimen. El privilegio está limitado a materia criminal, pero es tan vasto como el mal contra el cual tiende a proteger."

Sobre el mismo extremo citó con aprobación las siguientes palabras del Juez Presidente Marshall—mientras actuaba como Juez de la Corte de Circuito para el Distrito de Virginia—en *Burr's Trial* (1 Burr's Trial 244, 1807), usadas para contestar el argumento de que un testigo no podía negarse a contestar el argumento de que un testigo no podía negarse a contestar una pregunta a menos que su contestación, desconectada de otro testimonio, fuera suficiente para condenarlo: "Esto sería tornar la regla casi enteramente inútil. Muchos eslabones frecuentemente componen la cadena de testimonio que es necesario para condenar a un individuo de delito. Le parece al Tribunal que el verdadero

---

(³) Una investigación ante el gran jurado federal se consideró como un "caso" criminal.

sentido de la regla es que ningún testigo debe ser obligado a proporcionar ninguno de ellos en su contra. No es solamente posible si que probable que un testigo, al revelar un solo hecho, esté completando el testimonio necesario en su contra, y para todo propósito efectivo acusarse a sí mismo tan completamente como si estuviera revelando todas las circunstancias necesarias que se requieren para una convicción. El hecho revelado puede en sí ser insuficiente, pero todos los demás hechos sin él pueden también ser insuficientes. Mientras esto quede oculto en su pecho, él está a salvo; pero sáquesele de ahí y entonces él está expuesto a una acusación. La regla que declara que ninguna persona será obligada a incriminarse a sí misma sería obviamente infringida si se obligara a un testigo a revelar un hecho de esta naturaleza."

■ El privilegio contra la autoincriminación no solamente incluye evidencia que revele los elementos del delito si que también aquélla de la cual los funcionarios investigadores puedan obtener otra evidencia del delito. *Blau* v. *United States*, 340 U.S. 159, 95 L. ed. 170; *Rogers* v. *United States*, 340 U.S. 367, 95 L. ed. 344; *Hoffman* v. *United States*, 341 U.S. 479, 95 L. ed. 1118; 50 Mich. L. Rev. 605; 49 Mich. L. Rev. 1228.

■ Y si se obtiene, mediante coacción, amenazas o promesas de inmunidad, la confesión extrajudicial de un acusado, ésta, así como cualquier otra evidencia descubierta u obtenida por el funcionario investigador como resultado de los cauces abiertos por dicha confesión, es inadmisible en un proceso contra dicho acusado. Si se admite, una convicción basada en evidencia de tal naturaleza no puede prevalecer. (⁴)

---

(⁴) Véase *Stroble* v. *California*, 343 U.S. 181, 96 L.ed. 529, en el cual, citando los casos de *Malinski* v. *New York*, 324 U.S. 401, 89 L. ed. 1029 y *Lyons* v. *Oklahoma*, 322 U.S. 596, 597, nota 1, 88 L. ed. 1481, el Tribunal Supremo consideró que de haber sido involuntaria—resolvió que no lo era—una confesión hecha por un acusado al Fiscal de un condado del Estado de California, sobre la comisión de un delito de asesinato en primer grado, admitida como lo fué dicha confesión en el juicio, la convicción del acusado no hubiera podido sostenerse, "aun cuando la evidencia,

■ Dicho privilegio, sin embargo, puede ser renunciado, ya que el lenguaje de la Enmienda V en el sentido de que ninguna persona "será obligada", no impide que un testigo declare voluntariamente sobre algo que pueda incriminarlo. Si éste desea la protección del privilegio, debe reclamarlo, o de lo contrario no se considerará que ha sido "obligado" dentro del significado de la Enmienda. *Vajtauer* v. *Comm'r of Immigration*, 273 U.S. 103, 71 L. ed. 560; *United States* v. *Monia*, 317 U.S. 424, 87 L. ed 376; Wigmore, ob. cit., sección 2276(*b*)(1). Véanse, además, *The Privilege Against Self-Incrimination: The Doctrine of Waiver*, 65 Yale Law Journal 105; Corwin, *The Supreme Court's Construction of the Self-Incrimination Clause*, 29 Mich. L. Rev. 1. Si un acusado ocupa, en su defensa o en defensa de un coacusado, la silla testifical, renuncia a dicho privilegio. Wigmore, ob. cit., sección 2276(*b*)(2). Si hace una confesión extrajudicial voluntariamente, ésta es admisible en evidencia en el proceso en su contra, porque él renunció, al así hacerla, a dicho privilegio.(⁵)

---

aparte de dicha confesión, pudiera haber sido suficiente para sostener el veredicto del jurado." Para un estudio sobre el alcance de las confesiones y su admisibilidad en evidencia, así como su relación con la Enmienda V —y la Enmienda XIV en casos de tribunales estatales—véanse también: *Hopt* v. *Utah*, 110 U.S. 574, 28 L. ed. 262; *Sparf and Hansen* v. *United States*, 156 U.S. 51, 39 L. ed. 343; *Bram* v. *United States*, 168 U.S. 532, 42 L. ed. 568; *Wan* v. *United States*, 266 U.S. 1, 69 L. ed. 131; *Brown* v. *Mississippi*, 297 U.S. 278, 80 L. ed. 682; *McNabb* v. *United States*, 318 U.S. 332, 87 L. ed. 819; *United States* v. *Mitchell*, 322 U.S. 65, 88 L. ed. 1140; *Haley* v. *Ohio*, 332 U.S. 596, 92 L. ed. 224; *Upshaw* v. *United States*, 335 U.S. 410, 93 L. ed. 100; *Watts* v. *Indiana*, 338 U.S. 49, 93 L. ed. 1801; *Turner* v. *Pennsylvania*, 338 U.S. 62, 93 L. ed. 1810; *Harris* v. *South Carolina*, 338 U.S. 68, 93 L. ed. 1815; 18 L.R.A. (N.S.) 796; 50 L.R.A. (N.S.) 1084; 28 L. ed. 262; 42 L. ed. 568; 69 L. ed. 131; 93 L. ed. 115; 79 A.L.R. 457; 24 A.L.R. 703; 23 A.L.R. 1383; 43 Ill. L. Rev. 442; 42 Mich. L. Rev. 679; 56 Harv. L. Rev. 1008; 47 Cal. L. Rev. 1214.

(⁵) La regla en esta jurisdicción es que para que una confesión sea admisible en evidencia, debe establecerse satisfactoriamente que la misma fué hecha voluntariamente, libre de coacción o promesa. *Pueblo* v. *Medina*, 72 D.P.R. 254; *Pueblo* v. *Rivera*, 71 D.P.R. 124; *Pueblo* v. *Díaz*, 65 D.P.R. 443; *Pueblo* v. *Declet*, 65 D.P.R. 23; *Pueblo* v. *Montes*, 64 D.P.R.

Cuando un testigo elige él mismo renunciar su privilegio —que es sólo para su protección y no para la protección de otras personas—y revela en su testimonio conexiones criminosas, debe seguir adelante y hacer una revelación total de los hechos. Si una acusación está prescrita por haber transcurrido el período para iniciar el proceso, un testigo está obligado a contestar cualquier pregunta aun cuando hubiere podido incriminarse, de no estar prescrito el delito. Igualmente, si el testigo ya ha sido perdonado por el jefe ejecutivo, no puede de ahí en adelante invocar el privilegio, ya que su posición respecto al delito que se investiga es como si éste nunca se hubiera cometido. *Brown* v. *Walker*, supra, y casos allí citados.

## II

*Propósito y Alcance de los Estatutos Concediendo Inmunidad.*

 De otro lado, el Estado puede remover el privilegio contra la autoincriminación mediante la aprobación de estatutos que concedan inmunidad contra las consecuencias de prestar testimonio incriminatorio, cuando la inmunidad conferida por dichos estatutos es coextensiva con el privilegio constitucional que se remueve. *Counselman* v. *Hitchcock*, supra; *Brown* v. *Walker*, supra; *Heike* v. *United States*, 227 U.S. 131, 57 L. ed. 450; *United States* v. *Monia*, supra.

Muchas veces, en la administración de la justicia criminal, los funcionarios investigadores necesitan evidencia que no puede ser obtenida precisamente por la existencia de dicho privilegio. Para hacer asequible y obligatoria dicha evidencia, es que el Estado aprueba estatutos concediendo inmunidad absoluta contra procesos, como un equivalente adecuado de la garantía constitucional. La inmunidad se confiere a cambio de evidencia que de otro modo no podría obtenerse.

---

321; *Pueblo* v. *Lebrón*, 61 D.P.R. 657; *El Pueblo* v. *Kent*, 10 D.P.R. 343; *El Pueblo* v. *Rivera* (a) *Panchito*, 7 D.P.R. 332. Dado el desarrollo de los trámites en el tribunal a quo, es claro que no se trata en este recurso de determinar el carácter ni la admisibilidad de la confesión del peticionario *en evidencia*, ni de los efectos de su admisión en la convicción del acusado.

En esa forma, el privilegio contra la autoincriminación es sustituído por la inmunidad contra procesos.

"Un estatuto de inmunidad, no es equivalente a una amnistía para el crimen. No está predicado en un sentido de magnanimidad hacia los criminales, ni designado para borrar los delitos. Tampoco para ser usado como una trampa por el gobierno. Su único propósito es facilitar la administración de la justicia criminal, haciendo asequible evidencia necesaria, imposible de conseguir sin la inmunidad." Dangel, *Criminal Law* (1951) pág. 192.

La protección constitucional contra la autoincriminación y la inmunidad conferida por estatuto, son correlativas. Éste confiere inmunidad solamente en la extensión en que la constitución establece el privilegio. "La inmunidad no va más allá de la compulsión; es un mero sustituto para la garantía constitucional y es coextensivo con ella. Para crear inmunidad, el testimonio debe ser tal que el testigo pueda legalmente negarse a darlo en virtud de la protección constitucional. El estatuto obliga a dar el testimonio y únicamente hasta ese punto la inmunidad existe." *Brown* v. *Walker*, supra; *Heike* v. *United States*, supra; *Dangel*, ob. y pág. cit. Véanse, además, las siguientes anotaciones sobre el alcance de los estatutos de inmunidad: 154 A.L.R. 428; 145 A.L.R. 1416; 118 A.L.R. 602; 48 L. ed. 860; 65 L. ed. 138.

En el caso de *Counselman* v. *Hitchcock*, el Tribunal Supremo Nacional declaró inconstitucional la Ley original Sobre Comercio Interestatal de 4 de febrero de 1887, 49 U.S.C.A. sección 1, que contenía una disposición sobre inmunidad de testigos, ya que si bien la misma impedía el uso de evidencia contra éstos, no impedía su procesamiento como resultado de información obtenida de su testimonio. El tribunal indicó que solamente inmunidad absoluta podía justificar que se obligara a declarar a un testigo si él reclamaba su privilegio contra la autoincriminación.

En el de *Brown* v. *Walker*, resolvió que la inmunidad conferida por la Ley del Congreso de 11 de febrero de 1893,

49 U.S.C.A. sección 46—Ley sobre Comercio Interestatal— que concedía inmunidad a las personas que testificaran o produjeran evidencia ante dicha Comisión en obediencia a una citación, satisfacía suficientemente la garantía constitucional de la Enmienda V. Dicho estatuto se aprobó por el Congreso como consecuencia de la decisión en *Counselman* v. *Hitchcock*, por la cual se decretó, como hemos visto, la inconstitucionalidad de la disposición sobre inmunidad contenida en la Ley de Comercio Interestatal original, o sea la aprobada el 4 de febrero de 1887, 49 U.S.C.A. sección 1. Explicando el propósito y alcance de la inmunidad conferida por la Ley de 1893 cuya constitucionalidad sostenía, el tribunal se expresó así:

"Es enteramente cierto que el estatuto no tiene por miras salvaguardar, ni es posible que ningún estatuto salvaguarde, al testigo del desprecio personal y del oprobio que conlleva la revelación de su crimen. Pero como hemos dicho anteriormente, la jurisprudencia es copiosa y casi unánime al efecto de que si el testimonio es pertinente al caso, el hecho de que la declaración denigre al testigo ante la opinión pública, no exime a éste de su deber de declarar. Aquél que comete un delito debe prever las consecuencias que en su reputación y buen nombre pueda tener la revelación de su acto y no debe pedir a los tribunales que protejan aquello que él estimó tenía tan poco valor. El bienestar y la seguridad de toda una comunidad no debe ponerse frente a la reputación de un criminal confeso, quien no debe, bien en justicia o en moral, negarse a revelar lo que puede ser de gran utilidad pública, con el fin de que sus vecinos piensen bien de él. El propósito del privilegio constitucional no es el de ayudar al testigo a salvar su reputación y sí el de protegerlo de ser obligado a suministrar evidencia para sostener su convicción. Si se le concede inmunidad legal contra acción criminal, el posible perjuicio de su reputación es una razonable pena a que debe ser sometido en aras del bienestar general. Una vez aceptado que el hecho de que su testimonio pueda perjudicar su reputación—aunque no lo incrimine—no le concede al testigo el privilegio del silencio, necesariamente conduce a aceptar simultáneamente que si ese testimonio tiende a incriminarle pero al mismo tiempo opera como un perdón a su delito, el hecho

de que el daño a la reputación subsista, no le hace más acreedor a la inmunidad en este caso que en el anterior."

En el de *Heike* v. *United States*, supra, resolvió que la inmunidad conferida por la Ley Sherman de 1903, 15 U.S.C.A. sección 32, según enmendada en 1906, 15 U.S.C.A. sección 33, protegía a los testigos en la misma forma en que la Enmienda V los protegía; que la Enmienda V no justificaba reclamar el privilegio contra procesos por delitos remotamente conectados con el testimonio prestado, y que, en consecuencia, la inmunidad conferida por la Ley Sherman debía igualmente considerarse que no los protegía. Hablando a nombre del tribunal, el Juez Holmes se expresó así, al rechazar la teoría de que la cláusula de inmunidad de la Ley de 14 de febrero de 1903 era una de amnistía:

"Desde luego que hay una clara distinción entre una amnistía y la protección constitucional de *una parte* a ser obligada en un caso criminal a ser testigo contra sí misma. Enmienda 5. Pero el propósito obvio del estatuto es hacer asequible y obligatoria evidencia que de otro modo no podría obtenerse. No vemos razón para suponer que la Ley confiera una gratificación al crimen. Debe ser interpretada en tanto sus términos permiten razonablemente esa interpretación, como coextensiva con aquello que de otro modo sería el privilegio de la persona concernida. Creemos que su política es la misma de la ley original de 11 de febrero de 1893, cap. 83, 27 Stat. at L. 443, 49 U.S.C.A. sección 46, que disponía: 'Ninguna persona será excusada de comparecer y testificar,' etc. 'Pero ninguna persona será procesada,' etc., como dispone actualmente, demostrando así la correlación entre el privilegio constitucional y la inmunidad." (Bastardillas nuestras.)

En el de *United States* v. *Monia*, supra, se planteó la cuestión de si una persona que en obediencia a una citación comparecía ante un gran jurado que investigaba alegadas violaciones a la Ley Sherman y prestaba testimonio bajo juramento relacionado sustancialmente con el alegado delito, obtenía inmunidad contra cualquier proceso por dicho delito, de acuerdo con los términos de la Ley Sherman, aunque no

hubiera reclamado su privilegio contra la autoincriminación. El Tribunal Supremo se expresó así:

"La legislación envuelta [Ley Sherman] en el presente caso es clara en sus méritos y de su faz significa para el lego que si él es citado y juramentado y testifica, él tendrá inmunidad. En vez de ser una trampa para el Gobierno, como era la ley original [la Ley Sherman de 1903], los estatutos en cuestión, si se interpretan como el Gobierno desea, pueden muy bien ser una trampa para los testigos. El Congreso evidentemente tuvo la intención de dar a los funcionarios del Gobierno la elección de citar a un testigo y juramentarlo, con el entendido de que éste tendría completa inmunidad contra procesos con relación a cualquier asunto conectado sustancialmente con las transacciones sobre las cuales testificara, o retener el derecho de procesarlo dejando pasar la oportunidad de examinarlo. Que el Congreso no tuvo la intención de, ni por los estatutos en cuestión dispuso que, en adición, el testigo tuviera que reclamar el privilegio, parece claro. No nos corresponde a nosotros adicionar a la legislación lo que el Congreso omitió."

La Ley Sherman, en lo pertinente, disponía en la forma original en que fué aprobada en 1903, 15 U.S.C.A. sección 32: ". . . Ninguna persona será procesada o sometida a ninguna penalidad o convicción debido a ninguna transacción, materia o cosa sobre la cual pueda testificar o producir evidencia documental o de cualquiera otra clase, en cualquier procedimiento, acción o proceso bajo tales leyes [la Ley de Comercio Interestatal, la Ley Sherman contra Monopolios y otras leyes]; disponiéndose, además, que ninguna persona que así testifique estará exenta de acusación o castigo si cometiera perjurio al así testificar."

El 30 de junio de 1906 se agregó a la anterior disposición, lo siguiente: "Bajo las disposiciones de inmunidad [de la referida ley y de otras], la inmunidad se extenderá solamente a personas naturales que, en obediencia a una citación, presten testimonio bajo juramento o produzcan evidencia documental o de cualquier otra clase bajo juramento." 15 U.S.C.A. sección 33. Esta adición en 1906 a la Ley

Sherman se hizo como consecuencia de una decisión de la Corte de Distrito para el Distrito Norte de Illinois en el caso de *United States* v. *Armour & Co.*, 142 Fed. 808, en el sentido de que una comparecencia voluntaria—y el prestar testimonio y dar información sin haber mediado citación—producía el efecto de conferir inmunidad contra procesos bajo la Ley Sherman, ya que la inmunidad conferida por esta ley era más amplia que el privilegio establecido por la Enmienda V. Considerando que, de prevalecer la interpretación dada al estatuto por la referida corte, cualquier persona podría a su arbitrio obtener inmunidad contra procesos dando voluntariamente información a cuerpos investigativos, fué que el Congreso aprobó la enmienda de 30 de junio de 1906.

### III

*Propósito y Alcance de la Ley núm. 13 de 9 de abril de 1941.*

Examinemos ahora, a la luz de los principios expuestos, el problema con que aquí nos confrontamos.

La Ley núm. 13 aprobada el 9 de abril de 1941, en virtud de la cual—según el acusado—él obtuvo inmunidad, dispone en sus secciones 1 y 2 lo siguiente:

"Sección 1.—Ninguna persona será procesada, castigada o confiscados sus bienes por testificar o producir evidencia de cualquier clase en un procedimiento, proceso o investigación criminal, y tal inmunidad cubrirá al declarante no sólo en lo declarado por él acerca del delito que se investigue, sino en relación con cualquier responsabilidad en que pudiera haber incurrido con respecto a otros delitos; y toda persona estará obligada a comparecer o declarar ante un fiscal, juez municipal o de paz, cuando éstos la citaren como testigo en una investigación que estuvieren practicando dichos funcionarios; *Disponiéndose,* que la negativa a comparecer o declarar constituirá desacato, que será castigado por la corte de distrito del distrito judicial donde hubiese tenido lugar la citación, o donde el testigo se niegue a declarar, mediante querella presentada ante dicha corte por el funcionario encargado de la investigación, en un procedimiento sumario en el que el querellado tendrá dos días para contestar dicha querella, formulando las alegaciones que estimare perti-

nentes, debiendo ventilarse la vista dentro de los cinco (5) días siguientes a la contestación del querellado.

"Sección 2.—Esta Ley no se interpretará en el sentido de obligar a una persona a ser testigo contra sí mismo en ninguna causa criminal, y sólo será aplicable a personas naturales."

En *Pueblo* v. *Quiñones*, 69 D.P.R. 731, dijimos que esta ley fué aprobada como resultado de una opinión emitida el primero de noviembre de 1939 por el hoy fenecido Juez Angel R. de Jesús, actuando como Juez Asociado de Turno, en un recurso de *mandamus* instado ante este Tribunal por El Pueblo de Puerto Rico contra el entonces Juez, también hoy fenecido, Domingo Sepúlveda, de la Corte de Distrito de Ponce. Los hechos que dieron origen a dicha petición de mandamus fueron los siguientes: En el curso de una investigación, el fiscal del distrito citó a una testigo para que prestara declaración ante él. Ésta se negó a declarar bajo la alegación de que su testimonio podía incriminarle. El fiscal recurrió al juez de distrito en solicitud de que se ordenara la citación de la testigo para que en presencia del tribunal contestara las preguntas que habría de formularle el fiscal o, en su defecto, mostrara causas por las cuales no debía ser castigada por desacato. Dictada la orden, la testigo compareció ratificando su negativa a contestar las preguntas del fiscal. Éste le pidió entonces al juez que le informara a la testigo que respecto a la investigación que él estaba conduciendo, ella no sería procesada y que por lo tanto debía contestar sus preguntas. El juez se negó a ello, basándose en que los artículos 239 y 241 del Código de Enjuiciamiento Criminal(⁶) eran inaplicables a una inves-

---

(⁶) Dichos artículos disponen:

"Artículo 239.—Cuando dos o más personas hayan sido incluídas en una misma acusación, el tribunal podrá en cualquier tiempo antes de que los acusados hayan empezado su defensa, decretar a petición del fiscal, la exclusión del juicio, de cualquiera de los acusados, con objeto de que sirva como testigo del poder público."

"Artículo 241.—El decreto mencionado en los dos artículos precedentes equivale a la absolución del acusado excluído y no podrá por lo tanto, seguírsele otro proceso por el mismo delito."

tigación conducida por el fiscal, ya que el proceso criminal aún no se había iniciado, y que por lo tanto carecía de jurisdicción para conceder la inmunidad solicitada. Al declarar sin lugar la solicitud de mandamus, el Juez de Turno recomendó a la Asamblea Legislativa la aprobación de un estatuto sobre inmunidad, diciendo lo siguiente:

"Para que el estatuto sea suficiente no basta que exprese que la declaración no se usará en su contra. Es necesario que garantice al testigo que no será procesado ni estará sujeto a penalidad o confiscación de bienes por cualquier transacción, materia o cosa acerca de la cual haya declarado o producido evidencia. Véase la Ley del Congreso de los Estados Unidos de 25 de febrero de 1903 (15 U.S.C.A. sec. 32) declarada suficiento en el caso de *Brown* v. *Walker,* 161 U.S. 591, 40 L. ed. 819.

"A nuestro juicio es necesario que un estatuto semejante al últimamente citado sea adoptado por nuestra Asamblea Legislativa, *evitando así que en muchos casos el privilegio contra la propia incriminación pueda convertirse en un obstáculo infranqueable para el descubrimiento y castigo de los delitos.*" (Bastardillas nuestras.)

En el citado caso de *Pueblo* v. *Quiñones,* contestando el argumento de que en virtud de los artículos 239 y 241 del Código de Enjuiciamiento Criminal y de la Ley núm. 13, supra, un acusado llamado como testigo en el juicio por un coacusado debía ser obligado a declarar aunque su declaración lo incriminara, dijimos lo siguiente: "Ninguno de dichos artículos [239 y 241 del Código de Enjuiciamiento Criminal y 43 del Código Penal] tuvo por objeto conceder inmunidad a un acusado llamado a declarar por un coacusado. Tampoco es ése el propósito de la Ley núm. 13 antes mencionada. Esta inmunidad se concede *a los testigos de cargo y a los llamados por un fiscal, juez municipal o de paz para declarar en una investigación que se estuviere practicando por alguno de dichos funcionarios.*" (Bastardillas nuestras.)

La situación que tendió a remediar la Asamblea Legislativa de Puerto Rico con la aprobación de la Ley núm. 13

fué, indudablemente, la apuntada en su opinión por el Juez de Turno y que dió origen al recurso de mandamus a que antes hicimos referencia: proporcionar un medio para obligar a un testigo citado en un procedimiento, proceso o en una investigación que se estuviere practicando, a dar testimonio contra un acusado, concediendo a dicho testigo, a cambio de su declaración, inmunidad absoluta si ésta resultare incriminatoria para él. Que no fué el propósito legislativo hacer extensiva a una persona contra quien pesara ya una acusación o se hubiere iniciado algún proceso—un proceso criminal comienza con el arresto del acusado—la inmunidad que confirió a aquélla que hubiere sido citada "como testigo", según los términos de su sección 1, es evidente. Expresamente dispuso el legislador, por su sección 2, que dicha Ley núm. 13 "no se interpretará en el sentido de obligar a una persona a ser testigo contra sí mismo en ninguna causa criminal." En otras palabras, hizo claro su propósito de que la referida ley no intentaba ser un sustituto para todas las personas con derecho a invocar el privilegio contra la autoincriminación—entre las cuales están evidentemente, pero no exclusivamente, las acusadas de delito—y sí sólo para aquéllas que eran citadas como *testigos* en cualquier procedimiento, proceso o en una investigación que se estuviere practicando. En cuanto a los acusados o personas bajo proceso, la Ley núm. 13 no removió el privilegio contra la autoincriminación. Éste ha quedado en toda su plenitud, y a ellos no se les puede *obligar* a dar testimonio. En cuanto a los *testigos* citados en procedimientos, procesos o investigaciones, el privilegio ha sido removido mediante la garantía de inmunidad que establece en su sección 1, que es absoluta y, por lo tanto, coextensiva con el privilegio de que se les priva.

En el caso de autos, Batalla estaba bajo arresto. Contra él se había iniciado un proceso. Le amparaba la garantía constitucional—párrafo 3, artículo 2, Ley Orgánica—de no ser obligado a dar testimonio incriminatorio. Si ese derecho

suyo fué violado y se obtuvo de él una confesión involuntaria —y por ende inadmisible en evidencia—por haber mediado coacción, amenazas o promesas de inmunidad, véase 7 A.L.R. 419, no es cosa de la cual en este estado del caso podamos conocer, dado el desarrollo de los trámites en el tribunal a quo y la naturaleza del presente recurso. Pero evidentemente, la Ley núm. 13 no le confirió, como acusado, inmunidad contra procesos por declarar ante el fiscal. Él no era en ese momento un mero testigo, que es al que obliga dicha ley a prestar testimonio, y por ende, al cual concede inmunidad. Y el fiscal no podía ofrecérsela, no sólo por su condición de acusado, si que también porque la Ley núm. 13 no autoriza, ni bajo ella se necesita, oferta alguna de inmunidad de parte del funcionario investigador, (7) ya que la ley opera automáticamente, y la inmunidad protege al testigo que ha sido citado tan pronto éste declara bajo juramento, sin que sea necesario que reclame el privilegio contra la autoincriminación. *United States* v. *Monia*, supra. Contra: *State* v. *Davidson*, 242 Wis. 406, 8 N. W.2d 275. Véase también anotación en 145 A.L.R. 1496.

Si Batalla, como sostiene, tiene derecho bajo la Ley núm. 13 a ser exonerado de responsabilidad criminal por haber los fiscales utilizado su testimonio en los procedimientos de hábeas corpus instados por los coacusados Palóu y Castro para establecer causa probable contra éstos, o si tiene derecho a tal exoneración bajo dicha ley y bajo los artículos 239 y 241 del Código de Enjuiciamiento Criminal, son cuestiones sobre las cuales, dentro del presente recurso y en el estado actual del récord, no podemos ni debemos dictaminar ahora.

---

(7) La concesión de inmunidad se considera una función eminentemente legislativa. *Doyle* v. *Hofstader*, 257 N.Y. 244, 177 N.E. 489, 87 A.L.R. 417. Sobre la facultad, en general, de los fiscales para ofrecer inmunidad, y las distintas formas y circunstancias en que puede ésta favorecer a los testigos, véase 13 A.L.R. 2d 1439.

## IV

### Las Cuestiones Prejudiciales.

 Bajo el estado de nuestro derecho procesal penal[8] no cometió error el juez recurrido al resolver que el peticionario no podía plantear, por vía de una alegación especial *(special plea in bar)*, su derecho a la inmunidad. Tal derecho, cuando existe, sólo puede plantearse como defensa, dentro de su alegación negando la acusación, *Rebstock* v. *Superior Court*, 80 Pac. 65, (Cal., 1905), [9] ya que, según se ha sostenido en los casos de *Brown* v. *Walker* y *Heike* v. *United States*, supra, la cláusula sobre inmunidad de la Ley Sherman ofrece "protección contra el éxito de una acusación, disponible al acusado como defensa, y no inmunidad contra la acusación en sí", y que cuando esta defensa es impropiamente desestimada, puede ser base para la revocación de la sentencia contra el acusado.

"La protección que contra proceso ofrece la ley a un testigo por un delito que él revele es, en derecho, equivalente a su inocencia del delito revelado. El testigo, considerado en ley como inocente, si se procesara por el delito que ha sido obligado a revelar, está en la misma posición que otras personas inocentes y no en una posición mejor." *State* v. *Nowell*, 58 N. H. 314.

## V

### La Alegación de Culpabilidad y la Negativa a Permitir Retirarla.

 Al hacer la relación de los trámites seguidos en estos casos en el tribunal a quo, transcribimos la moción por la cual Batalla, luego de haber intentado establecer, mediante alegación especial *(special plea in bar)*, su defensa de inmunidad, solicitó se le declarara convicto de los hechos alegados

---

[8] Artículos 151, 162, 163, 165, 166 y 167 del Código de Enjuiciamiento Criminal.

[9] Contra: *Scribner* v. *State* (Okla., 1913), 132 Pac. 933.

en todas las acusaciones contra él radicadas. Si esta última alegación constituye una válida alegación de culpabilidad, ello le impediría plantear, bien en apelación o por *certiorari*, cualesquiera defensas excepto aquéllas dirigidas a atacar la suficiencia de las acusaciones por no constituir delito los hechos imputados, y la jurisdicción del tribunal, pues todas las demás defensas se considerarían renunciadas. *Weir* v. *United States*, 92 F.2d 634; *Kachnic* v. *United States*, 53 F.2d 312; *Spirow* v. *United States*, 24 F.2d 796; *People* v. *Brown*, 140 Cal. App. 616. Si, por el contrario, dicha alegación no constituye una válida alegación de culpabilidad, entonces la misma no debió haber sido aceptada por el juez sentenciador y una vez aceptada fué error no permitir que se retirara. Veamos.

De la propia moción solicitando se le declarara convicto en todas las causas, aparece no sólo que el peticionario tenía como única finalidad la de apelar para ante este Tribunal— con el evidente propósito de señalar como error la negativa del tribunal a examinar y resolver, oyendo la prueba correspondiente antes del juicio, la cuestión relativa a su alegada inmunidad—si que insistía en su derecho a ser exonerado en todas las causas por la inmunidad reclamada, invocando en dicha moción, entre otras cosas, el conocimiento judicial del tribunal en cuanto al hecho de que su testimonio había sido usado por los fiscales en los procedimientos de hábeas corpus seguidos contra los coacusados Palóu y Castro, explicando a la vez en ella por qué admitía "los hechos alegados en todas las acusaciones" y pedía que se le declarara convicto de los mismos, al afirmar que "la defensa de inmunidad es una que presupone la admisión por el acusado de los hechos denunciados".

La moción de referencia no constituye—no puede constituir—alegación de culpabilidad suficiente para justificar las convicciones de Batalla. Los hechos en ella expuestos no daban margen para someter dicha moción a interpretaciones

de si era una declaración de culpabilidad voluntaria([10]) o no, que tuviera que ser investigada, en cuanto a dicho extremo,([11]) por el juez sentenciador. Por dicha moción Batalla, no obstante admitir haber realizado los actos criminales a él imputados, insistía en su derecho a ser exonerado de responsabilidad criminal en todas las causas contra él seguidas, por virtud de la inmunidad que reiteradamente, y a través de todos los incidentes habidos, reclamaba. La exoneración de una persona en virtud de la defensa de inmunidad no se predica en el hecho de que no se realizó acto alguno criminoso, sino más bien en el de que, a pesar de la realización de tal acto, no procede exigírsele responsabilidad criminal por el mismo. Por lo tanto, en el caso de autos la admisión de Batalla—aun cuando voluntariamente hecha—de los hechos alegados en las acusaciones, no es determinante de una válida alegación de culpabilidad cuando, coetáneamente con dicha admisión, se insiste en el derecho a una exoneración total.([12])

En esas condiciones no puede afirmarse que la intención, ni el propósito de Batalla en los procesos contra él seguidos, fuera admitir responsabilidad criminal con miras a sufrir las consecuencias legales de dicha admisión. En efecto, si bien él admitía la realización del acto criminoso, negaba toda responsabilidad ante la ley, basándose en su alegada inmunidad. Y esto, lejos de constituir una confesión de culpabilidad, en estricto derecho constituye una negación absoluta de responsabilidad criminal.

De otro lado, no existe en el récord ante nos el más remoto indicio de que Batalla, al admitir los hechos alegados en las

---

([10]) Una vez leída al tribunal por el abogado de Batalla dicha moción, el juez procedió a interrogar extensamente al acusado sobre la "voluntariedad" de su declaración de culpabilidad, quedando satisfecho de que la misma se hacía voluntariamente.

([11]) Al ser interrogado por el tribunal, el acusado entonces aceptó personalmente haber realizado los hechos imputados en las acusaciones.

([12]) Batalla insistió en su derecho a ser exonerado por virtud de la inmunidad reclamada, aun después de denegada su solicitud para que se le permitiera retirar la alegación de culpabilidad.

acusaciones—negando, al mismo tiempo, responsabilidad por virtud de la inmunidad que reclamaba e insistiendo en su derecho a ser exonerado—considerara que su admisión constituía una renuncia de ese alegado derecho. *Lowe* v. *State,* 73 Atl. 637, (Md., 1909).

En tales condiciones debemos resolver que la alegación de Batalla no fué, en derecho, una alegación válida de culpabilidad y que la misma no debió haber sido admitida por el tribunal a quo. *Lowe* v. *State,* supra; *People* v. *Ross,* 100 N.E. 2d 923. *Cf. Parker* v. *Johnston,* 29 F. Supp. 829. Una vez admitida, sin embargo, habiendo Batalla en esa etapa del proceso solicitado que se le permitiera retirar dicha alegación, el tribunal debió haber usado su discreción en favor de dicha solicitud, independientemente de los razonamientos, o fundamentos, en apoyo de la misma, sobre todo cuando en la moción a ese efecto, Batalla insistió en que su alegación de "culpabilidad", como cuestión de derecho, era una de "inocente", en virtud de la defensa de inmunidad en que descansaba dicha moción. El no haberlo hecho constituye error que produce la nulidad de la sentencia dictada. *Lowe* v. *State,* supra. Véanse, también, 110 A.L.R. 228; 66 A.L.R. 628; 20 A.L.R. 1145 y 6 A.L.R. 694.

En virtud de lo expuesto *se anulan las sentencias recurridas y serán devueltos los casos a la sala de su origen para ulteriores procedimientos de acuerdo con esta opinión.*

El Juez Asociado Sr. Ortiz no intervino.